# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PHARMACEUTICAL RESEARCH &
MANUFACTURERS OF AMERICA, et al.,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES, et al.,

*Defendants*.

Case No. 1:20-cv-03402-TJK

## MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

Sean C. Griffin (D.C. Bar No. 499537)
Rebecca K. Wood (D.C. Bar No. 473616)
Erika L. Maley (D.C. Bar No. 1008714)
Daniel J. Hay (D.C. Bar No. 1047969)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel.: (202) 736-8000
Fax: (202) 736-8711
sgriffin@sidley.com
rwood@sidley.com
emaley@sidley.com
dhay@sidley.com

*Counsel for Council for Affordable Health
Coverage*

Robert A. Long, Jr. (D.C. Bar No. 415021)
Benjamin C. Block (D.C. Bar No. 47905)
Julie Dohm (D.C. Bar No. 1660119)
Thomas Brugato (D.C. Bar No. 1013523)
COVINGTON & BURLING LLP
One City Center
850 10th Street, NW
Washington, D.C. 20001
Tel: (202) 662-6000
Fax: (202) 662-6302
rlong@cov.com
bblock@cov.com
jdohm@cov.com
tbrugato@cov.com

*Counsel for Pharmaceutical Research and
Manufacturers of America*

*Additional Counsel Listed on Following Page*

Aliza R. Karetnick (*pro hac vice*)
Laura E. Gavin (*pro hac vice*)
BALLARD SPAHR LLP
1735 Market Street, Floor 51
Philadelphia, PA 19103
Tel: (215) 864-8367
Fax: (215) 864-8999
karetnicka@ballardspahr.com
gavinl@ballardspahr.com

*Counsel for Partnership for Safe Medicines*

Constantinos G. Panagopoulos
(D.C. Bar. No. 430932)
BALLARD SPAHR LLP
1909 K Street NW #1100
Washington, DC 2005
Tel: (202) 661-2200
Fax: (202) 661-2299
cgp@ballardspahr.com

*Counsel for Partnership for Safe Medicines*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BACKGROUND AND PROCEDURAL HISTORY ............................................... 2

    A.    Federal Law Extensively Regulates Prescription Drugs ........................... 2

    B.    Congress Conditioned Canadian Importation on Strict Safety and Cost-Saving Requirements, Which HHS Secretaries Recognized Could Not Be Met. ............................................................................................................. 5

    C.    The Trump Administration Reverses Course on Importation ................... 7

    D.    States Take Extensive Steps to Implement SIPs ..................................... 10

    E.    Plaintiffs Challenge the Certification and the Final Rule. ..................... 11

ARGUMENT ........................................................................................................ 12

I.    Plaintiffs Have Standing. ............................................................................. 12

    A.    Defendants Have Violated Plaintiffs' Members' Procedural Rights. ..... 13

    B.    Defendants Have Caused Plaintiffs' Members to Incur Financial Costs ............. 16

    C.    Plaintiffs' Members Will Suffer Further Injury Once a SIP Is Approved. ........... 18

    D.    These Injuries Are "Actual or Imminent." ............................................. 20

        1.    Plaintiffs have plausibly alleged that SIP approval is likely in the near future. ................................................................................ 20

        2.    Plaintiffs have plausibly alleged that SIP approval will cause them injury. ...................................................................................... 22

        3.    Plaintiffs are not required to wait for SIP approval before bringing their claims. .................................................................. 23

II.    Plaintiffs' Claims Are Ripe ......................................................................... 27

    A.    Courts Should Not Dismiss Cases for Lack of Prudential Ripeness. ..... 27

    B.    Plaintiffs' Claims Are Prudentially Ripe. .............................................. 28

        1.    Plaintiffs' claims are fit for judicial resolution. ......................... 28

        2.    To the extent relevant, the hardship inquiry favors Plaintiffs. ... 31

III.    Plaintiffs Have Stated APA Procedural Claims. .......................................... 33

    A.    Plaintiffs Properly Challenge the Certification Under the APA. ........... 33

        1.    The Certification is a "rule" under the APA. .............................. 33

2.      Plaintiffs were deprived of the opportunity for notice and
comment.......................................................................... 36

B.      Plaintiffs Plausibly Allege that the SIP Process Violates Their Procedural
Rights. ......................................................................................... 37

1.      SIPs are rules subject to notice-and-comment. ......................................... 37

2.      Even if SIPs are informal adjudications, the Final Rule violates
Plaintiffs' procedural rights by denying them an opportunity to
participate........................................................................ 38

C.      Plaintiffs Properly Challenge Defendants' Failure to Consult with Other
Officials......................................................................................... 41

CONCLUSION................................................................................................ 43

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ................................................................................................... 28

*Am. Fuel & Petrochem. Mfrs. v. EPA*,
    937 F.3d 559 (D.C. Cir. 2019) .................................................................................. 41

*Animal Legal Def. Fund v. Vilsack*,
    237 F. Supp. 3d 15 (D.D.C. 2017) ........................................................................... 39

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) .................................................................................... 12

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*,
    901 F. Supp. 2d 19 (D.D.C. 2012) ........................................................................... 12

*Atl. States Legal Found. v. EPA*,
    325 F.3d 281 (D.C. Cir. 2003) .................................................................................. 28

*Attias v. CareFirst, Inc.*,
    865 F.3d 620 (D.C. Cir. 2017) ........................................................................... 12, 13

*Bennett v. Spear*,
    520 U.S. 154 (1997) ....................................................................................... 16, 23, 31

*Blanchette v. Conn. Gen. Ins. Corps.*,
    419 U.S. 102 (1974) ................................................................................................... 32

*Block v. SEC*,
    50 F.3d 1078 (D.C. Cir. 1995) ........................................................................... 39, 41

*Brit. Caledonian Airways, Ltd. v. C. A. B.*,
    584 F.2d 982 (D.C. Cir. 1978) .................................................................................. 36

*Cablevision Sys. Corp. v. FCC*,
    649 F.3d 695 (D.C. Cir. 2011) .................................................................................. 28

*In re Canadian Imp. Antitrust Litig.*,
    470 F.3d 785 (8th Cir. 2006) ...................................................................................... 4

*Cap. Area Immigrants Rts. Coal. v. Trump*,
    471 F. Supp. 3d 25 (D.D.C. 2020) ........................................................................... 14

*Cement Kiln Recycling Coal. v. EPA*,
    493 F.3d 207 (D.C. Cir. 2007) .................................................................................. 29

*Chamber of Commerce v. EPA*,
    642 F.3d 192 (D.C. Cir. 2011) ...............................................................................8

*Chevron, U.S.A., Inc. v. FERC*,
    193 F. Supp. 2d 54 (D.D.C. 2002) .......................................................................18

*Chlorine Inst., Inc. v. Fed. R.R. Admin.*,
    718 F.3d 922 (D.C. Cir. 2013) .............................................................................25

*Ciox Health, LLC v. Azar*,
    435 F. Supp. 3d 30 (D.D.C. 2020) .......................................................................30

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) .............................................................................................42

*City of Waukesha v. EPA*,
    320 F.3d 228 (D.C. Cir. 2003) .............................................................................17

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .............................................................................................18

*Colo. River Water Conserv. Dist. v. United States*,
    424 U.S. 800 (1976) .............................................................................................27

*Common Cause v. Trump*,
    506 F. Supp. 3d 39 (D.D.C. 2010) .......................................................................28

*Cook v. FDA*,
    733 F.3d 1 (D.C. Cir. 2013) ...................................................................................3

*CSI Aviation Servs., Inc. v. Dep't of Transp.*,
    637 F.3d 408 (D.C. Cir. 2011) .............................................................................30

*Ctr. for Biological Diversity v. Dep't of Interior*,
    563 F.3d 466 (D.C. Cir. 2009) ......................................................................13, 24

*Ctr. for Biological Diversity v. EPA*,
    861 F.3d 175 (D.C. Cir. 2017) ..............................................................14, 15, 16

*Ctr. for Law & Educ. v. Dep't of Educ.*,
    396 F.3d 1152 (D.C. Cir. 2005) ....................................................................15, 16

*DEK Energy Co. v. FERC*,
    248 F.3d 1192 (D.C. Cir. 2001) ...........................................................................24

*Est. of Boyland v. USDA*,
    913 F.3d 117 (D.C. Cir. 2019) .............................................................................16

*Fla. Audubon Soc'y v. Bentsen,*
    94 F.3d 658 (D.C. Cir. 1996) ........................................................................15, 16

*Fla. Power & Light Co. v. EPA,*
    145 F.3d 1414 (D.C. Cir. 1998) ...........................................................................31

*Forester v. Consumer Prods. Safety Comm'n,*
    559 F.2d 774 (D.C. Cir. 1977) ..............................................................................36

*Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ...............................................................................................12

*Growth Energy v. EPA,*
    5 F.4th 1 (D.C. Cir. 2021) .....................................................................................13

*Haase v. Sessions,*
    835 F.2d 902 (D.C. Cir. 1987) ........................................................................21, 42

*Hancock Cnty. Bd. of Supervisors v. Ruhr,*
    487 F. App'x 189 (5th Cir. 2012) .........................................................................12

*Hawkins v. Haaland,*
    991 F.3d 216 (D.C. Cir. 2021) ..............................................................................14

*Hudson v. FAA,*
    192 F.3d 1031 (D.C. Cir. 1999) ...........................................................................38

*Humane Soc'y v. Vilsack,*
    797 F.3d 4 (D.C. Cir. 2015) ..................................................................................43

*Hutton v. Nat'l Bd. of Examiners in Optometry,*
    892 F.3d 613 (4th Cir. 2018) ................................................................................18

*Int'l Brotherhood of Teamsters v. Dep't of Transp.,*
    724 F.3d 206 (D.C. Cir. 2013) ..............................................................................19

*Int'l Internship Program v. Napolitano,*
    718 F.3d 986 (D.C. Cir. 2013) ..............................................................................38

*Jerome Stevens Pharms. v. FDA,*
    402 F.3d 1249 (D.C. Cir. 2005) ...........................................................................21

*Lexmark Int'l v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) .........................................................................................16, 27

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..................................................................................... *passim*

*Mendoza v. Perez*,
   754 F.3d 1002 (D.C. Cir. 2014) .......................................................................38

*Milk Indus. Found. v. Glickman*,
   132 F.3d 1467 (D.C. Cir. 1998) .......................................................................34

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) .........................................................................................26

*N. Mariana Islands v. United States*,
   686 F. Supp. 2d 7 (D.D.C. 2009) ....................................................................40

*NAACP v. Trump*,
   298 F. Supp. 3d 209 (D.D.C. 2018) ...................................................................8

*Nat'l Ass'n of Broadcasters v. FCC*,
   789 F.3d 165 (D.C. Cir. 2015) .........................................................................24

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
   417 F.3d 1272 (D.C. Cir. 2005) ............................................................28, 29, 32

*Nat'l Council for Adoption v. Blinken*,
   4 F.4th 106 (D.C. Cir. 2021) ............................................................................38

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*,
   752 F.3d 999 (D.C. Cir. 2014) .........................................................................31

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ....................................................................34, 35

*Nat'l Treas. Employees Union v. OPM (In re OPM Data Sec. Breach Litig.)*,
   928 F.3d 42 (D.C. Cir. 2019) ...........................................................................18

*Nat. Res. Def. Council v. Wheeler*,
   955 F.3d 68 (D.C. Cir. 2020) ...........................................................................35

*Neustar, Inc. v. FCC*,
   857 F.3d 886 (D.C. Cir. 2017) ....................................................................35, 38

*New Jersey v. EPA*,
   989 F.3d 1038 (D.C. Cir. 2021) ...................................................................17, 40

*Nichols v. Bd. of Trustees of Asbestos Workers Loc. 24 Pension Plan*,
   835 F.2d 881 (D.C. Cir. 1987) ....................................................................39, 41

*Ohio Forestry Ass'n v. Sierra Club, Inc.*,
   523 U.S. 726 (1998) ....................................................................................26, 30

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983)..................................................................................................31

*PBGC v. LTV Corp.*,
    496 U.S. 633 (1990)..................................................................................................39

*NB ex rel. Peacock v. District of Columbia*,
    682 F.3d 77 (D.C. Cir. 2012)....................................................................................21

*RAI Care Ctrs. of Md. I, LLC v. OPM*,
    459 F. Supp. 3d 124 (D.D.C. 2020)..........................................................................12

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006)....................................................................................................18

*Sackett v. EPA*,
    566 U.S. 120 (2012)..................................................................................................31

*Scenic Am., Inc. v. Dep't of Transp.*,
    836 F.3d 42 (D.C. Cir. 2016)....................................................................................21

*Sentara-Hampton Gen. Hosp. v. Sullivan*,
    980 F.2d 749 (D.C. Cir. 1992)..................................................................................34

*Sherley v. Sebelius*,
    610 F.3d 69 (D.C. Cir. 2010)..............................................................................23, 24

*Sprint Commc'ns, Inc. v. Jacobs*,
    571 U.S. 69 (2013)....................................................................................................27

*State Farm Mut. Auto. Ins. Co. v. Dole*,
    802 F.2d 474 (D.C. Cir. 1986)..................................................................................30

*State Nat'l Bank of Big Spring v. Lew*,
    795 F.3d 48 (D.C. Cir. 2015)....................................................................................25

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)............................................................................................20, 27

*Teva Pharms. USA, Inc. v. Azar*,
    369 F. Supp. 3d 183 (D.D.C. 2019)..........................................................................26

*Teva Pharms. USA, Inc. v. Sebelius*,
    595 F.3d 1303 (D.C. Cir. 2010)................................................................................31

*Town of Chester v. Laroe Estates*,
    137 S. Ct. 1645 (2017)..............................................................................................12

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021) .................................................................................20

*United Food & Com. Workers Union Loc. 751 v. Brown Grp.*,
517 U.S. 544 (1996) ....................................................................................12

*United States v. Genendo Pharm.*,
485 F.3d 958 (7th Cir. 2007) .........................................................................4

*United States v. Nova Scotia Food Prods. Corp.*,
568 F.2d 240 (2d Cir. 1977) .........................................................................37

*United States v. Rx Depot, Inc.*,
290 F. Supp. 2d 1238 (N.D. Okla. 2003) .......................................................4

*Vermont v. Leavitt*,
405 F. Supp. 2d 466 (D. Vt. 2005) .................................................................4

*Village of Bensenville v. FAA*,
367 F.3d 1114 (D.C. Cir. 2004) ...................................................................28

*Wellness Pharmacy, Inc. v. Becerra*,
No. 20-CV-3082 (CRC), 2021 WL 4284567 (D.D.C. Sept. 21, 2021) ...............24, 30, 31, 33

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ....................................................................................28

*Whitman-Walker Clinic, Inc. v. HHS*,
485 F. Supp. 3d 1, 29 (D.D.C. 2020) ...........................................................20

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
165 F.3d 43 (D.C. Cir. 1999) ................................................................24, 30

**Statutes**

5 U.S.C. § 551 ...........................................................................................33, 38

5 U.S.C. § 553 ...................................................................................33, 34, 36

5 U.S.C. § 554 ...............................................................................................36

5 U.S.C. § 555 ........................................................................................39, 41

5 U.S.C. § 704 ...............................................................................................31

21 U.S.C. § 251 ..............................................................................................9

21 U.S.C. § 331 ..............................................................................................3

21 U.S.C. § 333 ......................................................................................................38

21 U.S.C. § 351 ........................................................................................................3

21 U.S.C. § 352 ........................................................................................................3

21 U.S.C. § 355 ........................................................................................................3

21 U.S.C. § 381 ........................................................................................................3

21 U.S.C. § 384 ...........................................................................................5, 36, 37

21 U.S.C. § 384 (2000) ............................................................................................5

21 U.S.C. § 582 ........................................................................................................4

Drug Supply Chain Security Act, 21 U.S.C. § 360eee *et seq.* ................................4

Federal Agricultural Improvement and Reform Act of 1996 § 147, 7 U.S.C. §
    7256..................................................................................................................34

Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub.
    L. No. 108-173,
        § 804.........................................................................................................32
        § 1122.........................................................................................................6

Medicine Equity and Drug Safety Act, Pub. L. No. 106-387, § 804, 114 Stat. 1549.....................5

**Other Authorities**

21 C.F.R. § 10.25 ...................................................................................................40

21 C.F.R. § 10.30 ...................................................................................................40

21 C.F.R. § 251.2 ...................................................................................................38

21 C.F.R. § 251.3 .....................................................................................................9

21 C.F.R. § 251.5 .....................................................................................................9

21 C.F.R. § 251.14 ...................................................................................................8

21 C.F.R. § 251.20 .................................................................................................32

Alex M. Azar II, Sec'y of HHS, Remarks on Drug Pricing Blueprint (May 14,
    2018), https://www.hhs.gov/about/leadership/secretary/speeches/2018-
    speeches/remarks-on-drug-pricing-blueprint.html.........................................7

DOJ, *Attorney General's Manual on the Administrative Procedure Act* 59 (1947).....................36

Exec. Order No. 13,938, 85 Fed. Reg. 45,757 (2020) ...............................................7, 40

Exec. Order No. 14,036, 86 Fed. Reg. 36,987 (2021) ...................................................22

FDA, Docket Details:  Documents, No. 2019-5711,
    https://www.regulations.gov/docket/FDA-2019-N-5711 ......................................41

FDA, Human Drug Imports (last updated Aug. 23, 2021),
    https://www.fda.gov/drugs/guidance-compliance-regulatory-
    information/human-drug-imports ...........................................................................22

FDA, *Importation of Prescription Drugs: Final Regulatory Impact Analysis*, No.
    FDA-2019-N-5711 (Sept. 23, 2020), https://downloads.regulations.gov/FDA-
    2019-N-5711-1259/attachment_1.pdf ....................................................................19

HHS, *Report to the White House Competition Council* (Sept. 9, 2021),
    https://aspe.hhs.gov/sites/default/files/2021-09/Drug_Pricing_Plan_9-9-
    2021.pdf ................................................................................................................22

HHS, *Task Force Report on Drug Importation* (2004, *available at*
    http://www.safemedicines.org/wp-content/uploads/2018/03/HHS-
    Report1220.pdf ...........................................................................................3, 4, 6, 7

Importation of Prescription Drugs, 85 Fed. Reg. 62,094 (Oct. 1, 2020) ............................. *passim*

Interim Order Respecting Drug Shortages (Safeguarding the Drug Supply), 154 C.
    Gaz. Pt. I 3670 (2020) (Can.)..................................................................................27

Letter from Sec'y Donna Shalala, HHS, to Pres. W.J. Clinton (Dec. 26, 2000),
    *reprinted in* 148 Cong. Rec. S6910 (daily ed. July 17, 2002) ..................................6

Letter from Sec'y Tommy Thompson, HHS, to Sen. James Jeffords (July 9,
    2001), *reprinted in* 148 Cong. Rec. S6910–11 (daily ed. July 17, 2002)................6

Letter from William Hubbard, FDA, to Gregory Gonot, Cal. Dep't of Justice
    (Aug. 25, 2003), *available at*
    https://web.archive.org/web/20050205021912/http:/www.fda.gov/opacom/gon
    ot.html ....................................................................................................................4

Notice of Proposed Rulemaking, 84 Fed. Reg. 70,796 (Dec. 23, 2019).........................7

PhRMA, Comment Letter on Importation of Prescription Drugs Proposed Rule,
    FDA Dkt. 2019-N-5711 (Mar. 9, 2020),
    https://downloads.regulations.gov/FDA-2019-N-5711-1236/attachment_1.pdf....................42

Press Release, Governor Ron DeSantis Announces Florida's Submittal of Drug
Importation Proposal to Federal Government (Nov. 23, 2020),
https://www.flgov.com/2020/11/23/governor-ron-desantis-announces-floridas-
submittal-of-drug-importation-proposal-to-federal-government/ ...........................................22

Proposal for the Importation of Prescription Drugs from Canada (Nov. 2020),
*available at* https://www.safemedicines.org/wp-content/uploads/2019/09/SIP-
Proposal-to-HHS-11-23-2020.pdf ........................................................................................22

**INTRODUCTION**

Congress has determined that certain prescription drugs may be imported from Canada only if importation poses no additional risk to public health and safety *and* significantly reduces the cost of covered prescription drugs to the American consumer. For two decades, Secretaries of the Department of Health and Human Services ("HHS") consistently concluded that these strict requirements could not be met. In October 2020, however—in response to an Executive Order—the Secretary, who had only recently declared drug importation an unsafe "gimmick," certified exactly the opposite. The Secretary did so even though the accompanying Final Rule exempted imported drugs from important safety protections and made no cost savings findings whatsoever.

Instead, the Secretary postponed consideration of safety and cost issues to separate, non-public application proceedings before the U.S. Food and Drug Administration ("FDA") from which drug manufacturers and other interested parties are excluded. At least two States have filed such applications. Florida reportedly has been told by the Biden Administration that its application will be approved and has allocated millions of dollars to prepare for rapid importation. Upon approval, manufacturers immediately will be subject to demands from importers to hand over trade secrets and other highly confidential business information. The Rule provides only 30 days to respond or face potential civil enforcement and criminal penalties for non-compliance. Because these demands raise complex issues that will take more than 30 days to resolve, manufacturers already have been required to devote time and resources to preparing for them.

Defendants nevertheless urge the Court to dismiss this case for lack of standing and ripeness. But Plaintiffs meet Article III's low bar for standing at the pleading stage because Plaintiffs have pleaded facts demonstrating there is a substantial risk that Plaintiffs' members will be harmed. Indeed, Plaintiffs' manufacturer members are *already* suffering harm because the short

deadlines imposed by the Rule effectively compel them to begin preparing to comply or risk incurring civil liability and criminal penalties for failing to do so.

Plaintiffs also allege that Defendants violated their procedural rights in multiple ways: by failing to provide notice and an opportunity for comment on the Secretary's Certification and on specific state applications and by failing to consult with the U.S. Trade Representative and the Commissioner of Customs and Border Protection. Defendants do not seriously challenge Plaintiffs' standing to bring these claims. Instead, Defendants move to dismiss these claims on the merits. That request is unwarranted. The Certification and approval of state applications meet the Administrative Procedure Act's ("APA's") definition of a "rule," and so are subject to the APA's notice-and-comment requirements. And Plaintiffs adequately alleged that the Secretary failed to engage in the required consultation.

Defendants' ripeness arguments largely repeat their standing arguments and fail for the same reasons. The Supreme Court has cast substantial doubt on the continuing validity of prudential ripeness, and in any event, that doctrine does not support dismissal. Plaintiffs have raised purely legal issues; both the Certification and the Final Rule are final agency actions; and "a more concrete factual setting" is unnecessary because this case will be decided on the administrative record.

This Court should deny Defendants' motion to dismiss.

## BACKGROUND AND PROCEDURAL HISTORY

### A.     Federal Law Extensively Regulates Prescription Drugs.

Federal law regulates virtually every aspect of the manufacture and distribution of prescription drugs. The U.S. drug supply chain is a "closed system" with "a level of safety for drug

products that is widely recognized as the world's gold standard."[1] This closed system is critical to ensuring that the drugs American patients receive will be safe, effective, and of high quality. *Id.*

With exceptions inapplicable to this case, a drug may not be introduced into interstate commerce unless it complies in full with a new drug application or abbreviated new drug application (respectively, "NDA" and "ANDA") approved by the FDA. *See* 21 U.S.C. §§ 331(d), 355(a). FDA's rigorous approval process scrutinizes not only what drugs are made of, but also where and how they are made, packaged, stored, labeled, and handled. FDA must approve not only the drug's ingredients and chemical composition, but also its label and "the methods used in, and the facilities and controls used for, the manufacturing, processing, and packing of such drug." *Id.* § 355(b)(1)(A)(iv), (vi). A drug may not be sold if it is "misbranded" or "adulterated." *Id.* § 331(a). A drug is misbranded if its "labeling is false or misleading in any particular." *Id.* § 352(a)(1). A drug is "adulterated" if its strength, quality, or purity differ from what the drug is represented to possess, or if the drug is packed or held in unsanitary conditions. *Id.* § 351(a)(1)–(2), (b)–(c).

Federal law tightly restricts the conditions under which prescription drugs may be imported into the United States. Introducing into interstate commerce a drug that lacks required approval or is misbranded or adulterated is a prohibited act. *Id.* § 331(a), (d). Such drugs must be refused admission into the United States. *Id.* §§ 331, 381(a); *Cook v. FDA*, 733 F.3d 1, 11 (D.C. Cir. 2013). This includes unapproved so-called "foreign versions" with the same chemical compounds as FDA-approved drugs. *See* HHS Task Force Report at 4.

In particular, FDA and courts have stated for decades that pharmaceutical wholesalers and others generally cannot import prescription drugs from Canada (or other countries), because such

---

[1] HHS, *Task Force Report on Drug Importation* at x (2004) ("HHS Task Force Report"), *available at* http://www.safemedicines.org/wp-content/uploads/2018/03/HHS-Report1220.pdf.

drugs differ from FDA-approved drugs. For example, Canadian drugs bear labeling and are packaged in ways that have not been approved by FDA. Thus, "virtually all drugs imported to the United States from Canada violate the [Federal Food, Drug and Cosmetic Act ("FDCA")] because they are . . . labeled incorrectly."[2] *See also* HHS Task Force Report at 5 ("Even if a manufacturer has FDA approval for a drug, the version produced for foreign markets may not meet all of the requirements of the FDA approval, and thus it may be considered to be unapproved in the U.S."). Federal courts have held that any drug imported from Canada (even if it has "the same chemical composition" as an FDA-approved drug) is *per se* unapproved because, at a minimum, "foreign labeling differs from domestic labeling." *In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 790 (8th Cir. 2006); *Vermont v. Leavitt*, 405 F. Supp. 2d 466, 474–75 (D. Vt. 2005) (holding that importation of drugs from Canada violated the FDCA); *United States v. Rx Depot, Inc.*, 290 F. Supp. 2d 1238 (N.D. Okla. 2003) (enjoining operation of company that arranged for U.S. patients' prescriptions to be filled by Canadian pharmacies); *accord United States v. Genendo Pharm.*, 485 F.3d 958, 961–62 (7th Cir. 2007) (finding that drug imported from Curaçao was unapproved).

To prevent the infiltration of counterfeit and adulterated drugs into the U.S. drug supply, Congress enacted the Drug Supply Chain Security Act, 21 U.S.C. § 360eee *et seq.* ("DSCSA"). The DSCSA prescribes track-and-trace requirements for drugs throughout the pharmaceutical distribution supply chain. For example, it prohibits supply chain participants from receiving product that is not encoded with a product identifier; product that lacks transaction history, transaction information, and a transaction statement; and product from an entity that is not an authorized trading partner. *See id.* § 582(c)(1)(A), (c)(2)–(3), (d)(1), (d)(3).

---

[2] Letter from William Hubbard, FDA, to Gregory Gonot, Cal. Dep't of Justice (Aug. 25, 2003), *available at* https://web.archive.org/web/20050205021912/http:/www.fda.gov/opacom/gonot.html.

**B.      Congress Conditioned Canadian Importation on Strict Safety and Cost-Saving Requirements, Which HHS Secretaries Recognized Could Not Be Met.**

In 2000, Congress enacted the Medicine Equity and Drug Safety ("MEDS") Act, which authorized the HHS Secretary to "promulgate regulations permitting pharmacists and wholesalers to import into the United States," from specified countries, certain prescription drugs other than biological products and certain controlled substances. Pub. L. No. 106-387, § 804, 114 Stat. 1549 (codified as amended at 21 U.S.C. § 384 (2000)); *see* Am. Compl., ECF No. 34-1 ("AC") ¶ 23. This authorization came with strict conditions: the newly-added Section 804 of the FDCA would take effect only if the HHS Secretary "demonstrate[d] to Congress that the implementation of [the statute] will—(1) pose no additional risk to the public's health and safety; and (2) result in a significant reduction in the cost of covered products to the American consumer." 21 U.S.C. § 384(*l*) (2000).

In 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 ("MMA"), which amended Section 804. Like the MEDS Act, the MMA provides that Section 804 will take effect only if the HHS Secretary makes the two-fold findings that importation will not pose risks to public health and safety and will result in significant reduction in cost of covered products to the American consumer. 21 U.S.C. § 384(*l*)(1). Section 804(b) authorizes the HHS Secretary, after consultation with the U.S. Trade Representative ("USTR") and Commissioner of Customs and Border Protection ("CBP"), to "promulgate regulations permitting pharmacists and wholesalers to import prescription drugs from Canada into the United States." Section 804(j) authorizes the HHS Secretary to waive prohibitions against the individual importation of certain prescription drugs from Canada and directs the Secretary to issue regulations with respect to individual imports meeting certain requirements. Plaintiffs refer to these two potential pathways as "commercial" and

"personal" importation, respectively.

For nearly two decades, HHS Secretaries from multiple Administrations, representing both major political parties, uniformly declined to find that importation could meet the stringent safety and cost criteria prescribed by Congress. AC ¶¶ 24–25, 40. As then-Secretary Donna Shalala wrote President Clinton in 2000, "flaws and loopholes" in Section 804 "undermine[d] the potential for cost savings associated with prescription drug reimportation and could pose unnecessary public health risks."[3] And as then-Secretary Tommy Thompson explained to Congress in 2001, "[a]fter a thorough review of the law," FDA "concluded that it would be impossible to ensure that the MEDS Act would result in no loss of protection for the drugs supplied to the American people."[4]

The MMA did not alter HHS's view. In response to a mandate imposed by the MMA, HHS in 2004 convened a task force to study importation. *See* MMA § 1122; AC ¶ 34. The Task Force found that importation likely would result in increased risk to consumers and was unlikely to yield significant savings to consumers. Regarding safety, the Task Force found that importation "would increase the opportunity for counterfeit and other substandard drugs to enter and be dispersed into the U.S. drug distribution system." HHS Task Force Report at x, 35. Regarding cost savings, the Task Force found that much U.S. drug spending is dedicated to drugs that are legally or practically ineligible for importation and that intermediaries and increased testing costs would most likely substantially offset whatever price differentials existed. HHS Task Force Report at xi, xii, 65–80. As recently as 2018, then-HHS Secretary Azar stated that importation was nothing more than a "gimmick" that would have "no meaningful effect" on drug prices and could not "be safely

---

[3] Letter from Sec'y Donna Shalala, HHS, to Pres. W.J. Clinton (Dec. 26, 2000), *reprinted in* 148 Cong. Rec. S6910 (daily ed. July 17, 2002) (statement of Sen. Cochran).

[4] Letter from Sec'y Tommy Thompson, HHS, to Sen. James Jeffords (July 9, 2001), *reprinted in* 148 Cong. Rec. S6910–11 (daily ed. July 17, 2002) (statement of Sen. Cochran).

achieved."[5]

### C.     The Trump Administration Reverses Course on Importation.

In late 2019, Defendants issued a Notice of Proposed Rulemaking (the "NPRM") soliciting comments on a proposal to authorize commercial (but not personal) importation under Section 804. 84 Fed. Reg. 70,796 (Dec. 23, 2019). The NPRM acknowledged that HHS had, in the past, consistently rejected Section 804 implementation, that it was "unable to estimate . . . the savings to U.S. consumers," and that HHS's prior "concerns about public health and safety and the ability to achieve cost savings remain valid." *Id.* at 70,798–70,800. In July 2020, then-President Trump issued an Executive Order directing the HHS Secretary to finalize the rulemaking. Exec. Order No. 13,938, § 2(c), 85 Fed. Reg. 45,757, 45,757 (2020). Defendants then issued a Final Rule largely tracking the one proposed in the NPRM. *See* Importation of Prescription Drugs, 85 Fed. Reg. 62,094 (Oct. 1, 2020).

Under the Final Rule, States and Native American tribes are free to import certain drugs from Canada through Section 804 Importation Programs ("SIPs"). As part of a SIP, a U.S. pharmacist or wholesale distributor (the "Importer") will obtain drugs from Canadian wholesale drug distributors ("Foreign Sellers"), which will in turn acquire drugs directly from the relevant drugs' manufacturers. 85 Fed. Reg. at 62,094. The Importer is responsible for shipping the drugs to a U.S. Customs port of entry, where the drugs are tested for authenticity, degradation, and other factors. *Id.* at 62,095. If the drugs pass this testing, the Importer is responsible for removing the Canadian labeling and relabeling them with a modified version of the label for the analogous U.S. drug. *Id.* These activities and the modified packaging and labeling are not described in any FDA-

---

[5] Alex M. Azar II, Sec'y of HHS, Remarks on Drug Pricing Blueprint (May 14, 2018), https://www.hhs.gov/about/leadership/secretary/speeches/2018-speeches/remarks-on-drug-pricing-blueprint.html.

approved NDA or ANDA. *Id.* at 62,114. Hence, the Final Rule authorizes importation of drugs that are not FDA-approved to compete with the manufacturers' own FDA-approved drugs.

The Final Rule also exempts Importers from critical supply chain protections in the DSCSA, including the prohibitions on: receiving a product that is not encoded with a product identifier; receiving a product for which the previous owner did not provide transaction history, transaction information, and a transaction statement; and conducting a transaction with an entity that is not an authorized trading partner. *See* 21 C.F.R. §§ 251.14(d)(7). These exemptions and other provisions of the Final Rule introduce vulnerabilities in the supply chain, increasing the likelihood that counterfeit or adulterated drugs will enter the United States and thus posing additional risk to public health and safety. *See* Ex. A, Healthcare Distribution Alliance ("HDA") Decl. ¶¶ 21–24, 31–32 (members and association harmed by compromise of U.S.'s "closed" supply chain); Ex. B, American Pharmacists Association ("APhA") Decl. ¶¶ 12, 21–22 (same); Ex. C, Association of Accessible Medicines ("AAM") Decl. ¶¶ 12,  27 (members and association harmed by compromise of U.S.'s "closed" supply chain); Exs. D–H, PhRMA Member Decls. Section III.A (discussing increased safety risks associated with imported drugs, which are exempt from critical DSCSA requirements).[6] Importation of counterfeit or adulterated SIP drugs bearing

---

[6] Throughout this brief, we cite "PhRMA Member Decls." to refer collectively to the attached declarations submitted separately by Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") (Ex. D); Bristol Myers Squibb ("BMS") (Ex. E); Gilead Sciences, Inc. (Ex. F); Merck (Ex. G); and Sanofi (Ex. H).

To the extent that Plaintiffs are required to provide further support for their standing beyond the well-pled allegations of their complaint, they are entitled to do so by submitting affidavits. *See, e.g.*, *Chamber of Commerce v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011) (finding associational standing where "[a]long with its briefs, [plaintiff] submitted declarations from two of its . . . members alleging injury"); *NAACP v. Trump*, 298 F. Supp. 3d 209, 225 (D.D.C. 2018) (rejecting argument that plaintiff lacked standing because complaint did not allege specific members with standing, when plaintiff provided anonymous affidavits from members), *remanded on other grounds sub nom. DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891 (2020).

modified FDA-approved labeling increases the risk that a drug manufacturer will need to address product complaints, engage in recalls, and defend itself in product liability lawsuits. *See id.*; *see also* PhRMA Member Decls. Section III.F; Merck Decl. ¶ 62.

The Final Rule requires manufacturers to take burdensome steps to facilitate third parties' importation of drugs. Under the Final Rule, Importers can demand that the manufacturer either (1) agree to test the imported drugs for authenticity, degradation, and other factors at no cost to the Importer; or (2) turn over to the Importer all information necessary for the Importer to conduct the testing, including highly confidential and trade-secret information. AC ¶¶ 74–76. In addition, the manufacturer must make a detailed attestation that its U.S. and Canadian drugs are the same but for their labeling. *Id.* ¶¶ 77–78. The manufacturer must also provide executed batch records for each manufacturing line that the manufacturer used to produce either or both of the Canadian drug and the FDA-approved drug. *Id.* ¶ 76. And the manufacturer must consent to the Importer's use of the manufacturer's FDA-approved labeling, with certain additions mandated by the Final Rule. *Id.* ¶ 79. The attestation, detailed information statement, executed batch records, and labeling authorization are due within 30 calendar days of an Importer's demand. 21 C.F.R. §§ 251.3(a); 251.5(c)(4)(xii), (d), (e)(2). The Rule threatens civil enforcement and criminal prosecution for failure to disclose this information. *See id.* § 251(b); 85 Fed. Reg. at 62,103.

On the same day Defendants issued the Final Rule, then-Secretary Azar—who months earlier had called Section 804 a "gimmick" that could not be safely implemented—certified that implementation of the commercial-importation provisions of Section 804 by means of the Final Rule "pose[d] no additional risk to the public's health and safety and will result in a significant reduction in the cost of covered products to the American consumer."[7] Neither the Certification

---

[7] Gov't Br. Ex. 1, Ltr. from Alex M. Azar II, Sec'y of HHS, to Hon. Kevin McCarthy (Sept. 23,

nor the Final Rule made the requisite finding of cost savings. *See* 85 Fed. Reg. at 62,123 ("We are unable to estimate the cost savings from this final rule . . . ."); *see also id.* (displaying a blank table entitled "Summary of Benefits, Costs, and Distributional Effects of Final Rule").

### D.   States Take Extensive Steps to Implement SIPs.

Several States have taken steps to develop and implement SIPs. On November 23, 2020, Florida submitted its formal SIP proposal to FDA. AC ¶ 90. Florida seeks to import approximately 100 drugs, the majority of which are manufactured under applications held by identifiable PhRMA members (several of which are also members of CAHC). *Id.* ¶ 94.

Florida has appropriated millions of dollars to fund operation of the SIP. *Id.* ¶ 98. It has engaged a third-party logistics firm to carry out day-to-day operation of its proposed SIP, and it has retained a Canadian wholesale distributor to be the Foreign Seller. *Id.* ¶¶ 92–93. Florida Governor DeSantis has stated that the State is "ready to launch" as soon as the FDA approves its SIP, promising that the State will begin importing drugs "[w]ithin 90 days of approval." *Id.* ¶ 95.

On May 28, 2021, Governor DeSantis held a press conference at a warehouse newly constructed to store drugs imported under the SIP. *Id.* ¶ 96. He relayed that the Biden Administration had informed him that if Florida's SIP proposal had not been denied by the previous week—i.e., by late May 2021—"we could assume it was going to be approved." *Id.* ¶ 97; *see also id.* ("[W]e were told 'still under review,' if it's not nixed by last week, then they said we were going to be okay."). His office issued a press release that day stating that "[w]ithin 90 days of approval [of its SIP proposal], [the State] will be able to physically import prescription drugs and ensure that customs inspections are complete and that proper testing has taken place." *Id.* ¶ 96.

At least one other State, New Mexico, has also submitted a SIP proposal to FDA. *Id.* ¶ 100.

_____

2020), ECF No. 34-3.

At least four additional States—Colorado, Maine, New Hampshire, and Vermont—have state laws requiring them to set up importation programs. *Id.* ¶¶ 99–106. It is unclear whether these States have submitted SIP proposals because FDA does not make SIP proceedings public. *Id.* ¶ 106.

### E.   Plaintiffs Challenge the Certification and the Final Rule.

Plaintiffs are three organizations whose members have been—and will continue to be— harmed by the Certification and Final Rule. Pharmaceutical Research and Manufacturers of America ("PhRMA") represents the United States' leading innovative pharmaceutical research companies, including companies that make many of the drugs that Florida and other would-be SIP sponsors seek to import into the United States. *See id.* ¶¶ 1, 94, 101, 104. Partnership for Safe Medicines ("PSM") is an association of organizations and individuals with interests in protecting consumers from counterfeit, substandard, or otherwise unsafe medicines. *See id.* ¶ 2; *see generally* Ex. I, PSM Decl. The Council for Affordable Health Coverage ("CAHC") is a broad-based advocacy alliance with a focus on increasing competition, bringing down the cost of healthcare, and expanding affordable private health insurance coverage. *See id.* ¶¶ 3, 94, 101, 104; *see generally* Ex. J, CAHC Decl.

On November 23, 2020, Plaintiffs brought this action under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA") and the First Amendment to the U.S. Constitution challenging both the Certification and the Final Rule. ECF No. 1. On May 28, 2021, Defendants moved to dismiss. ECF No. 26. Plaintiffs filed an Amended Complaint ("AC") as of right on July 2, 2021, adding detailed allegations about the Florida and New Mexico SIP applications. ECF No. 31, ¶¶ 88–106; *see also* ECF No. 31-1. On August 27, 2021, Defendants renewed their motion to dismiss for lack of standing and further moved to dismiss Counts III and VI for failure to state an APA procedural claim. ECF No. 34.

## ARGUMENT

### I.    Plaintiffs Have Standing.

At the pleading stage, Article III standing poses a "low bar," requiring only that plaintiffs make "general factual allegations of injury resulting from the defendant's conduct." *Attias v. CareFirst, Inc.*, 865 F.3d 620, 625–26 (D.C. Cir. 2017). "In considering [a] motion to dismiss, [a] [c]ourt will 'accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor.'" *RAI Care Ctrs. of Md. I, LLC v. OPM*, 459 F. Supp. 3d 124, 128 (D.D.C. 2020) (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)). When multiple trade associations sue on behalf of their members, it is enough that a single member of a single trade association has standing to sue in its own right.[8] *See Town of Chester v. Laroe Estates*, 137 S. Ct. 1645, 1651 (2017) (suit justiciable so long as one plaintiff has standing); *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (trade association has standing if at least one member would have standing individually).[9]

---

[8] Defendants repeatedly complain that Plaintiffs have not identified specific members who have been or will be harmed by the Certification and Final Rule. *See, e.g.*, Gov't Br. 16–19, 22. In fact, the Amended Complaint names multiple PhRMA and CAHC members whose drugs are included in SIP proposals and which would have commented on SIP proposals had they been given the opportunity to do so. AC ¶¶ 84, 101, 104, 119. But even if Plaintiffs had not named specific members in their Amended Complaint, that omission would have been legally irrelevant. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 31 (D.D.C. 2012) (a "plaintiff need not identify the affected members by name at the pleading stage" (collecting cases)); *see also, e.g.*, *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012) ("We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing."); *see generally Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . .").

[9] The suit must also be germane to the association's purposes, and the claims asserted and relief requested must not require the participation of individual members, *see id.*, but Defendants do not dispute that these requirements clearly are satisfied in this case. *See, e.g.*, *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 546 (1996) ("[I]ndividual participation is not normally necessary when an association seeks prospective or injunctive relief for its members,"

—12—

As demonstrated in Sections A–C below, Plaintiffs clear "the low bar to establish their standing at the pleading stage" three times over. *Attias*, 865 F.3d at 622. *First*, Defendants have violated their members' procedural rights. *Second*, Plaintiffs' members are already suffering pecuniary harm because of the Final Rule and Certification. *Third*, Plaintiffs adequately allege that their members face a substantial risk of additional imminent harm from approval of a SIP.

As demonstrated in Section D below, Defendants' argument that Plaintiffs' injuries are not actual or imminent attempts to controvert well-pled allegations and ignores the ways in which the Certification and Final Rule are already harming Plaintiffs' members.

### A.      Defendants Have Violated Plaintiffs' Members' Procedural Rights.

When a plaintiff seeks to challenge the violation of its procedural rights, the plaintiff "can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992). Instead, Article III requires only that the right in question was "'designed to protect some threatened concrete interest' of the plaintiff" and "that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." *Ctr. for Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009) (quoting *Lujan*, 504 U.S. at 573 n.8); *see also Growth Energy v. EPA*, 5 F.4th 1, 27 (D.C. Cir. 2021) (procedural failure must "demonstrably increase[] some specific risk of . . . harms that imperil the members' particularized interests").

 Plaintiffs allege that Defendants deprived them, their members, and other members of the public of a meaningful opportunity to comment on the Certification (AC ¶ 110) or on specific SIP applications (*id.* ¶ 112), and also failed to consult with the USTR and CBP before issuing the Final Rule as Section 804(b) requires (*id.* ¶¶ 178, 180).

---

rather than individualized damages (quotation marks omitted)).

Plaintiffs also allege particularized, "concrete interest[s]" implicated by these deprivations. *See Lujan*, 504 U.S. at 572 n.7. For example, Plaintiffs' members will be adversely affected by: the misappropriation of their intellectual property; the importation into the United States of unapproved drugs, inherently posing increased risks of counterfeiting, adulteration, and accordant patient harm; reduced U.S. sales due to unlawful competition from SIP drugs; and being compelled to speak in favor of a program that they oppose. *See infra* Sections I.B & I.C; *see generally* PhRMA Member Decls. Section III.B (importation will force PhRMA Members to divulge trade secrets and confidential commercial information); *id.* Section III.C (detailing harms to PhRMA Members' trademark rights); *id.* Section III.D (same, for First Amendment rights); *id.* Section III.E (same, for reducing sales due to unlawful competition); AAM Decl. ¶¶ 30–34 (detailing commercial harm to PSM member resulting from drop in U.S. sales); HDA Decl. ¶¶ 21–24, 31–32 (discussing harm to organization and its members from increased counterfeit and adulterated drugs entering U.S. market); APhA Decl. ¶¶ 12, 21–22 (same); AAM Decl. ¶ 12 (same).

Plaintiffs have also established causation, which for a procedural-injury claim requires "two links": "(1) a connection between the omitted procedure and a government decision and (2) a connection between the government decision and the plaintiff's particularized injury." *Hawkins v. Haaland*, 991 F.3d 216, 224 (D.C. Cir. 2021) (cleaned up). Procedural standing does not require Plaintiffs "to show that but for the alleged procedural deficienc[ies] [Defendants] would have reached a different result. All that is necessary is to show that the procedural step was connected to the substantive result." *See Ctr. for Biological Diversity v. EPA*, 861 F.3d 175, 184 (D.C. Cir. 2017); *Cap. Area Immigrants Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 38 (D.D.C. 2020) (plaintiffs have standing if they "show 'a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to

[their] particularized interest'" (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc)). When it comes to procedural standing, there is also a "relaxed" redressability requirement: "A procedural-rights plaintiff need not show that court-ordered compliance with the procedure would alter the final [agency decision]," only that "the [agency] *could* reach a different conclusion." *Ctr. for Biological Diversity*, 861 F.3d at 185 (internal citations and quotation marks omitted).

Plaintiffs easily meet these standards. The "procedural step[s]" that HHS omitted, including necessary notice-and-comment and consultation procedures, were plainly "connected to the substantive result[s]"—that is, the challenged Certification and Final Rule. *Id.* at 184. If Defendants had complied with the procedural requirements they violated, it is possible that they would either have declined to issue any rule allowing for the importation of drugs from Canada or would have issued a rule providing for importation in a way that causes less harm to Plaintiffs' members and their interests. If afforded the opportunity, Plaintiffs and some of their members would have commented on the Certification and SIP proposals. *See* AC ¶¶ 112, 119; BMS, Gilead, Merck & Sanofi Decls. Section I. Indeed, PSM, PhRMA, and at least one of its members already commented on the Final Rule, and Plaintiffs submitted citizen petitions regarding SIP proposals. *See* AC ¶¶ 54, 112, 119; Ex. K, PhRMA Decl. Section I; PSM Decl. ¶ 7; CAHC Decl. ¶ 5. And USTR and CBP apparently were not provided the opportunity to contribute their input on the Certification, as Section 804(b) requires. This additional information, whether gathered through comments or consultation, may have affected the ultimate results. Again, Plaintiffs need not show that compliance with the required procedures "would" have altered the Certification or Rule, only that it "could" have done so. *Ctr. for Biological Diversity*, 861 F.3d at 185; *see also Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005) ("[T]his Court assumes the causal

relationship between the procedural defect and the final agency action.").[10]

Even if "the normal standards for . . . immediacy" applied here, they would not bar Plaintiffs' APA procedural claims. *See Lujan*, 504 U.S. at 572 n.7. This is not a situation in which "the agency action and the alleged injury stand at opposite ends of a long chain." *Ctr. for Law and Educ.*, 396 F.3d at 1161; *cf. Fla. Audubon Soc.*, 94 F.3d at 666 (no standing where potential injury required "lengthy chain of conjecture"). Defendants do not dispute that SIP proceedings are already pending, and that at least some of Plaintiffs' members will incur concrete harms upon approval of a SIP. Accordingly, Plaintiffs have alleged an injury sufficiently immediate to establish standing to challenge Defendants' denial of their procedural rights under the APA.[11]

### B.   Defendants Have Caused Plaintiffs' Members to Incur Financial Costs.

Plaintiffs also have standing because their members are already incurring substantial costs as a result of the challenged agency actions.[12] *See* AC ¶ 118; Ex. L, Covington Decl. ¶ 8; BIPI,

---

[10] For the reasons discussed below, *see infra* Sections I.B–D, Plaintiffs have also "demonstrate[d] a causal connection between the agency action and the alleged injury" by showing a "substantial probability" of harm due to the Challenged Actions. *See Ctr. for Biological Diversity*, 861 F.3d at 184.

[11] Defendants' contention that Plaintiffs fail to allege plausibly that the Certification or Final Rule violated their or their members' procedural interests, Gov't Br. 27–33, inappropriately conflates the merits of Plaintiffs' APA procedural claims with their standing to assert those claims. *See Est. of Boyland v. USDA*, 913 F.3d 117, 123 (D.C. Cir. 2019) (court must "assume, *arguendo*, the merits of [a] legal claim" for purposes of evaluating standing), *cert. denied*, 140 S. Ct. 947 (2020). And as demonstrated below in Section III, Plaintiffs *have* plausibly alleged that the Certification and Final Rule are procedurally defective.

[12] Defendants' passing argument (Gov't Br. 26–27) that Plaintiffs lack standing to challenge the Certification because, it contends, that action did not cause them any direct harm, is wrong. "Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." *Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014); *see also Bennett v. Spear*, 520 U.S. 154, 170–71 (1997). The causal link between the Certification and Plaintiffs' injuries is more than "fairly traceable." The Certification was a necessary precondition to the FDA's issuance of the Final Rule, which has harmed and is substantially likely to continue harming Plaintiffs' members in various ways. Those harms would be redressed by an order invalidating the Certification, which

Merck & Sanofi Decls. Section III.F (detailing compliance costs); *see also* HDA Decl. ¶¶ 34–36, 42 (Final Rule invalidates $500 million in DSCSA compliance costs and requires significant future investments in research and education). Because the Rule allows only 30 days for a manufacturer to provide certain information after it is requested by an Importer, some manufacturers have been forced to expend significant employee time, resources, and/or company money to evaluate actions necessary to respond to Importer requests. *See* Covington Decl. ¶ 8; *see also* BIPI, BMS, Merck & Sanofi Decls. Section III.F. Those efforts have included drafting work flows, templates, and other work product for use in responding to such requests; identifying the necessary materials, document types, and information necessary for responding to the requests; assigning responsibility to specific employees and company components for preparing responses to specific portions of those requests; identifying what information would need to be designated as confidential in PhRMA Members' responses; and analyzing whether and how PhRMA Members could perform the statutory testing themselves. Covington Decl. ¶ 8. Although a manufacturer can decline to provide the information necessary to conduct the statutory testing if the manufacturer conducts that testing itself, the Final Rule expressly states that the manufacturer will not be compensated for the costs of this testing. 85 Fed. Reg. at 62,119.

These compliance costs establish PhRMA Members' (and hence PhRMA's) standing to challenge the Certification and Final Rule. Courts routinely hold that plaintiffs have standing to challenge laws that burden them with increased compliance costs. *E.g.*, *New Jersey v. EPA*, 989 F.3d 1038, 1046 (D.C. Cir. 2021) ; *City of Waukesha v. EPA*, 320 F.3d 228, 234 (D.C. Cir. 2003) (per curiam). Plaintiffs have not "manufacture[d] standing by choosing to make expenditures based

---

Defendants acknowledge was "necessary to bring [Section 804] into effect" (Gov't Br. 1), and without which FDA would lack any statutory authority for the proposed commercial importation of Canadian drugs.

on hypothetical future harm that is not certainly impending." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Manufacturers incurred these expenses as a direct consequence of their obligation to comply in a very compressed timeframe with the burdens imposed on them by the Final Rule, not to "manufacture" an excuse to take Defendants to court. *Cf. id.*; Covington Decl. ¶ 8. Moreover, as further demonstrated below, *see infra* Section I.D, Plaintiffs have "adequately allege[d] a substantial risk of future [harm]." *See Nat'l Treas. Employees Union v. OPM (In re OPM Data Sec. Breach Litig.)*, 928 F.3d 42, 59 (D.C. Cir. 2019). Accordingly, "any expenses they have reasonably incurred to mitigate that risk likewise qualify as injury in fact." *In re OPM Data Sec. Breach Litig.*, 928 F.3d at 59; *Hutton v. Nat'l Bd. of Examiners in Optometry*, 892 F.3d 613, 622 (4th Cir. 2018) ("[T]he Court has recognized standing to sue on the basis of costs incurred to mitigate or avoid harm when a substantial risk of harm actually exists.").

### C.      Plaintiffs' Members Will Suffer Further Injury Once a SIP Is Approved.

Plaintiffs' members will suffer further injuries once a SIP is approved. As soon as a SIP is approved, Plaintiffs' members will immediately be subject to an obligation to provide, upon request by an Importer, an attestation containing information mandated by the Final Rule. The Final Rule thus compels manufacturers, upon SIP approval, to engage in speech regardless of whether it agrees with the contents of that speech. *See, e.g.*, AC ¶¶ 117, 189; *Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006) (compelled speech that undermines speaker's desired message works injury in fact regardless of whether speaker also suffers financial harm as a result). The Importer will also, upon SIP approval, be authorized to seek from the manufacturer the confidential commercial information and trade secrets inherent in the attestation, information statement, and executed batch records, as well as either free testing services or the confidential commercial information and trade secrets necessary to conduct the statutory testing,. AC ¶ 115(a); *Chevron, U.S.A., Inc. v. FERC*, 193 F. Supp. 2d 54, 61 (D.D.C. 2002) (compelled disclosure of confidential

information is injury in fact). And the Importer can begin using the manufacturer's FDA-approved labeling, including the trademarks included in that labeling, without compensating the manufacturer or obtaining the manufacturer's consent. AC ¶¶ 114, 115(b).

The subsequent importation of drugs from Canada will pile injury on injury. By marketing and distributing imported drugs under modified versions of manufacturers' labeling, Importers will dilute manufacturers' trademarks, reduce their goodwill, and contribute to consumer confusion that will likely result in increased compliance costs and product liability litigation for manufacturers whose drugs are imported under SIPs. *See, e.g., id.* ¶¶ 66, 67–72, 114; PhRMA Member Decls. Sections III.A, III.C & III.F. *See also* HDA Decl. ¶ 37 (operational compliance costs resulting from Rule); *id.* ¶ 39 (Rule exposes HDA's members to expanded legal and financial liability). As the Final Rule acknowledges, importation may reduce manufacturers' revenues by enabling consumers to substitute purchases of unapproved SIP drugs for drugs (both brand and generic) that have actually been approved by FDA. *See* 85 Fed. Reg. at 62,095 ("U.S.-based drug manufacturers may experience a transfer in U.S. sales revenues to [SIP Sponsors and Importers]."); *accord id.* at 62,123.[13] It is well-settled that "economic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Int'l Brotherhood of Teamsters v. Dep't of Transp.*, 724 F.3d 206, 211–12 (D.C. Cir. 2013). *See* PhRMA Member Decls. Section III.E (detailing economic harms due to unlawful competition); AAM Decl. ¶¶ 26, 30–31 (discussing "commercial harm to AAM members," including generic and biosimilar pharmaceutical manufacturers and distributors, "with disastrous effects on patient access to more affordable generic medicines").

---

[13] *See also* FDA, *Importation of Prescription Drugs: Final Regulatory Impact Analysis* at 23–24, No. FDA-2019-N-5711 (Sept. 23, 2020), https://downloads.regulations.gov/FDA-2019-N-5711-1259/attachment_1.pdf (enumerating various financial harms to drug makers from importation).

D.     **These Injuries Are "Actual or Imminent."**

Defendants do not dispute that Plaintiffs' manufacturer members will suffer injury-in-fact once FDA approves a SIP application covering those manufacturers' products. Defendants argue, however, that it is uncertain whether FDA will approve a SIP application, rendering any injury too conjectural and remote to support standing. *See* ECF No. 34-1 ("Gov't Br.") 16–27. These arguments miss the mark for multiple reasons.

To begin, as demonstrated in Sections A and B above, Plaintiffs and their members have *already* suffered procedural injury and incurred compliance costs. Moreover, standing does not require certainty of future harm. Rather, a plaintiff has standing so long as "there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021) ("sufficiently imminent and substantial" risk of future harm gives rise to standing to seek injunctive relief, not damages); *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 29 (D.D.C. 2020) ("Plaintiffs need only show a 'substantial risk' of the alleged harm, not an outright certainty."). Plaintiffs have adequately alleged there is a "substantial risk" that FDA will approve the Florida SIP in the near future, and that approval of that SIP will cause them further injury.

1.     *Plaintiffs have plausibly alleged that SIP approval is likely in the near future.*

In addition to submitting a formal SIP proposal, Florida has allocated tens of millions of dollars to setting up its SIP, hired a third party to operate the SIP (at a cost of up to $38 million over two years), and engaged a Canadian drug distributor to serve as its Foreign Seller. AC ¶¶ 3, 92–94. Those investments would be difficult to fathom if SIP approval were as uncertain as Defendants assert. More pointedly, as noted above, Florida Governor DeSantis stated in May that Biden Administration officials told the State to expect its proposal to be approved and that the

State was ready to import a substantial volume of drugs from Canada within 90 days of SIP approval. *Id.* ¶ 97.

In their brief, Defendants improperly attempt to controvert these detailed allegations. Among other things, Defendants' brief contends that "authorization of Florida's SIP Proposal . . . is far from certain, let alone imminent," Gov't Br. 21–22 (*contra* AC ¶ 108) and that the contrary statements of Florida's governor reflect merely an "applicant's opinion about their prospects," rather than what Biden Administration officials told the governor, Gov't Br. 23 (*contra* AC ¶ 97); *compare also id.* (stating that "FDA has received" only "two SIP Proposals, from . . . Florida and New Mexico"), *with* AC ¶ 106 (noting that FDA does not make SIPs public). But the Complaint's factual allegations must be taken as true. *See Jerome Stevens Pharms. v. FDA*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005); *see also NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012). Indeed, at the dismissal stage, a "plaintiff is protected from an evidentiary attack on his asserted theory by the defendant": while a plaintiff "can freely augment his pleadings with affidavits, . . . [a] defendant is barred at this stage of the proceedings from attacking the claims made therein." *Haase v. Sessions*, 835 F.2d 902, 907 (D.C. Cir. 1987). Any dispute as to the imminence of the Florida SIP approval can be resolved only on a complete administrative record at summary judgment. *See, e.g.*, *Scenic Am., Inc. v. Dep't of Transp.*, 836 F.3d 42, 49 (D.C. Cir. 2016); *see also Haase*, 835 F.2d at 907 (summary judgment is proper vehicle for defendant to test factual basis for standing).

In any event, Defendants' efforts to sweep Governor DeSantis's statements aside miss the mark. The governor's remarks are significant not because they represent his "opinion about [his] prospects," Gov't Br. 23, but because the Governor's statements about what *Biden Administration* officials told him plausibly support the allegation that SIP approval is imminent. Indeed, as

Defendants noted in their brief, *see* Gov't Br. 12, President Biden recently issued his own Executive Order directing FDA to work with States and Tribes to develop Section 804 programs.[14] And since the date Plaintiffs amended their complaint, HHS has stated that it is "working with [S]tates and Tribes to implement safe prescription drug importation programs."[15]

### 2. *Plaintiffs have plausibly alleged that SIP approval will cause them injury.*

Defendants do not (and cannot) contest that approval of the Florida SIP will cause harm to Plaintiffs' members. Approval of the Florida SIP will give the State a green light to import approximately 100 drugs, most of which are manufactured by PhRMA or CAHC members. *See* AC ¶ 94; PhRMA Member Decls. Section II; *see also generally* AAM Decl. (generic drug manufacturing and competition undermined by Final Rule). Those manufacturers will suffer further harm upon SIP approval because the manufacturers' sales revenues will decline when the State reduces its spending on those manufacturers' medications, as it intends to do. *See supra* Section I.C.[16] Manufacturers will also be subject to the numerous harms detailed above, including additional compliance costs, compelled speech, and the loss of trade secret and confidential

---

[14] *See* Exec. Order No. 14,036, § 5(q), 86 Fed. Reg. 36,987, 36,997–98 (2021).

[15] HHS, *Report to the White House Competition Council* at 19 (Sept. 9, 2021), https://aspe.hhs.gov/sites/default/files/2021-09/Drug_Pricing_Plan_9-9-2021.pdf; *see also* FDA, Human Drug Imports (last updated Aug. 23, 2021), https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-imports ("Consistent with the [EO], FDA will work with states and tribes that propose to develop importation programs in accordance with section 804 of the FD&C Act and the FDA's implementing regulation . . . .").

[16] State of Florida, Preliminary Section 804 Importation Program (SIP) Proposal for the Importation of Prescription Drugs from Canada (Nov. 2020), *available at* https://www.safemedicines.org/wp-content/uploads/2019/09/SIP-Proposal-to-HHS-11-23-2020.pdf. Although the document is labeled as a "preliminary" proposal, its date corresponds with when Florida formally submitted a SIP proposal for FDA review. *See* Press Release, Governor Ron DeSantis Announces Florida's Submittal of Drug Importation Proposal to Federal Government (Nov. 23, 2020), https://www.flgov.com/2020/11/23/governor-ron-desantis-announces-floridas-submittal-of-drug-importation-proposal-to-federal-government/.

commercial information protections. *Id.* Plaintiffs have thus adequately demonstrated not only that the Florida SIP is substantially likely to be approved, but also that approval of that SIP will cause its specific members to suffer pecuniary and other harms.

### 3.    *Plaintiffs are not required to wait for SIP approval before bringing their claims.*

Courts repeatedly find standing even when a plaintiff's theory of harm rests on future government action. For example, in *Bennett v. Spear*, the Supreme Court held that irrigation districts that received water from a Bureau of Reclamation irrigation project had standing to challenge a Fish and Wildlife Service biological opinion. 520 U.S. at 159–60. The opinion determined that the Bureau's operation of the project threatened two endangered species but that the Bureau could avoid jeopardizing the species by, *inter alia*, maintaining a certain level of water in two reservoirs. *Id.* Rejecting the government's argument that the districts lacked standing because it was uncertain whether plaintiffs would, in fact, receive less water for irrigation, the Court held that plaintiffs' general allegations "that the amount of available water will be reduced and that they will be adversely affected thereby" made it "easy to presume specific facts under which [they] will be injured." *Id.* at 168. The Court likewise rejected the government's argument that the plaintiffs lacked standing because any harm flowed directly from the Bureau's "as yet unidentified" decision to allocate them less water, rather than the Service's biological opinion. *Id.*

The D.C. Circuit likewise takes a practical approach to determining whether plaintiffs have standing when their theory of harm relies partly on future agency actions. For example, in *Sherley v. Sebelius*, the Circuit found that doctors who conducted research involving adult stem cells had standing to challenge agency action rescinding prior limits on funding stem-cell research. 610 F.3d 69 (D.C. Cir. 2010). The court accepted that the agency action would cause the doctors to face increased competition from embryonic-stem-cell researchers for a fixed amount of grant money,

which the doctors could challenge immediately without "wait[ing] until allegedly illegal transactions hurt [them] competitively." *Id.* at 72 (quotation marks omitted). It was immaterial that the doctors had not shown that the rescission of the funding limits would decrease the aggregate funding or that a grant application submitted by the doctors would ever compete with an application for funding embryonic-stem-cell research. *Id.* at 73. As the Court reasoned, the rescission of those funding limits would require competitors "to invest more time and resources to craft a successful grant application . . . an actual, here-and-now injury." *Id.* at 74. And while "no one can say exactly how likely the [d]octors [we]re to lose funding to projects involving [embryonic stem cells]," the court concluded that the probability was "substantial enough . . . to deem the injury to them imminent." *Id.* (citing *DEK Energy Co. v. FERC*, 248 F.3d 1192, 1196 (D.C. Cir. 2001), for the proposition that a "substantial (if unquantifiable) probability of injury shifts injury from 'conjectural' to 'imminent'" (quotation marks omitted)).

In short, these and other cases make clear that the prospect of future governmental action poses no categorical bar to suit.[17]  In trying to defeat standing, Defendants rely on inapt cases in

---

[17] *See also, e.g.*, *Nat'l Ass'n of Broadcasters v. FCC*, 789 F.3d 165, 168–69 (D.C. Cir. 2015) (holding that a broadcaster had standing to challenge FCC rules setting forth a framework for allocation of wireless broadcast spectrum by "repacking" existing holders of spectrum to new blocks of spectrum even though it was "unknown whether any . . . station will in fact be subject to repacking" based on the company's "reasoned predictions about" the agency's future actions and its own inability to comply with the repacking within the time allowed by the rule); *Ctr. for Biological Diversity*, 563 F.3d at 472–73, 479, 483–84 (petitioners had standing to challenge Interior's approval of a five-year Leasing Program that would expand oil and gas development off the coast of Alaska, even though that Program had only completed the first of four stages); *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 45, 51 (D.C. Cir. 1999) (environmental groups had standing to challenge the Forest Service's general authorization of oil and gas leasing in the Shoshone National Forest, even though plaintiffs brought suit before any relevant oil and gas leases had actually been issued by the Bureau of Land Management); *Wellness Pharmacy, Inc. v. Becerra*, No. 20-CV-3082 (CRC), 2021 WL 4284567, at *8–10 (D.D.C. Sept. 21, 2021) (plaintiff pharmacies had standing to challenge Memorandum of Understanding (MOU) establishing agreement between individual state pharmacy boards and FDA regarding enforcement of FDCA Section 503A; plaintiffs faced "substantial risk" either that States would "choose to sign the MOU

which the outcome of a regulatory process was so uncertain (and so reliant on intervening decisions by third parties not before the court) that it was no more than speculative that the regulatory process would ultimately harm the plaintiffs. Defendants' heavy reliance on *Chlorine Institute, Inc. v. Federal Railroad Administration*, 718 F.3d 922 (D.C. Cir. 2013), illustrates this point. A chlorine-industry trade group challenged a Federal Railroad Administration ("FRA") rule amending regulations requiring rail carriers to install safety systems on rail tracks. The rule required carriers to install safety systems on tracks by 2008 unless carriers showed that the tracks would not carry certain traffic as of 2015. *Id.* at 924. The FRA previously required carriers seeking such an exemption to meet a two-part safety test, asking whether alternative routes were substantially as safe and secure as the exempted route and that the exempted tracks would not have higher risks of the sort of accidents the safety systems were intended to prevent than would tracks on which such equipment had been installed. *Id.* at 925. The chlorine group challenged the FRA's subsequent elimination of that test, but the D.C. Circuit held that the group lacked standing. *Id.* at 927–28. As the court reasoned, it was not yet clear which tracks would be fitted with safety systems, "much less whether any . . . member's ability to show [hazardous materials] will be significantly affected because more tracks will not require [safety equipment] under the [new rule]." *Id.* at 928. The D.C. Circuit also noted that two other federal agencies would be responsible for shaping the outcome of these proceedings in a "tangled regulatory interaction." *Id.* at 928 n.8.

*Chlorine Institute* is inapposite to this case. The challenged rule there directly regulated rail carriers, not members of the chlorine industry; here, the agency actions regulate Plaintiffs' members directly. *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015)

---

and pass on its information-gathering burdens to them" or that other States would choose not to sign the MOU and subject pharmacies in those states to a five-percent limitation on interstate distribution of compounded drugs).

("'[T]here is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." (quoting *Lujan*, 504 U.S. at 561–62)). In *Chlorine Institute*, plaintiff's theory of injury depended on the outcome of a regulatory process the inputs into which were uncertain. Here, in contrast, Defendants are reviewing SIP applications that seek to import numerous drugs manufactured by Plaintiffs' members. And in *Chlorine Institute*, even if plaintiffs had correctly predicted the outcome of the regulatory process, it was still not clear that any member of the plaintiff association would be harmed as a result. Here, those harms are obvious.[18]

Finally, Defendants fall back on arguments that Plaintiffs' members or the Canadian Government could take other action to prevent drugs from Canada from being imported into the United States. This conjecture does not deprive Plaintiffs of standing.[19] Plaintiffs need only show

---

[18] *Teva Pharms. USA, Inc. v. Azar*, 369 F. Supp. 3d 183 (D.D.C. 2019), is similarly off-point. The court's analysis focused on the intricacies of the Hatch-Waxman Act's processes for granting exclusivity to the manufacturer of a generic drug and case-specific details calling into question whether the FDA would approve a competitor's ANDA. And unlike in this case—in which Florida has stated that federal authorities told the State to expect its SIP proposal to be approved—there was no "tentative approval as a signal or any other indication about the status of the FDA's review." *Id.* at 203.

[19] Defendants suggest in a footnote that Plaintiffs could decline "to sell the drugs to a known Foreign Seller, or by contractually prohibiting their re-sale through a SIP." Gov't Br. 24 n.7. But the possibility that some manufacturers may be able to do so does not mean that their injury is self-inflicted. Rather, putting manufacturers to the choice of changing their sale patterns or abandoning their proprietary interests demonstrates why plaintiffs have standing. *See Ohio Forestry Ass'n v. Sierra Club, Inc.*, 523 U.S. 726, 734 (1998); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155 (2010) (costs of testing to evaluate potential contamination due to challenged deregulation was "sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis even if . . . crops are not *actually* infected with the . . . gene" (emphasis added)). Either option would cause manufacturers to incur financial losses. That Plaintiffs' members may have some ability to choose *how* they will be harmed does not mean they have not suffered an injury.

Defendants also suggest that there is "uncertainty about the feasibility of implementing the Rule" because the Canadian Government issued an interim order prohibiting Foreign Sellers from distributing drugs to the United States unless they have "reasonable grounds to believe that the

that they face a substantial risk of harm, not rebut every conceivable way they might somehow escape that harm.

## II.     Plaintiffs' Claims Are Ripe.

Defendants' argument that Plaintiffs' claims are unripe largely repeats their incorrect arguments that Plaintiffs have not suffered "actual or imminent" injury. *See* Gov't Br. 34–39. Those arguments fail for the same reasons described above. *See Susan B. Anthony List*, 573 U.S. at 157 n.5 (Article III standing and constitutional ripeness "boil down to the same question"). Defendants argue that even if these claims are constitutionally ripe, the Court may still deem them to be prudentially unripe. But the Supreme Court has questioned whether prudential ripeness is a valid basis for dismissing an action that is within the Court's jurisdiction. In any event, Plaintiffs' claims are prudentially ripe. Plaintiffs assert purely legal challenges to the Certification and Final Rule. Delaying the adjudication of those claims serves no one's interests in this case.

### A.     Courts Should Not Dismiss Cases for Lack of Prudential Ripeness.

As a threshold matter, the Supreme Court has questioned the "continuing vitality of the prudential-ripeness doctrine." *Susan B. Anthony List*, 573 U.S. at 167–68. Indeed, prudential ripeness is in tension with the Supreme Court's repeated insistence that federal courts have the "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976); *accord Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 69 (2013); *see also, e.g.*, *Lexmark*, 572 U.S. at 126 (questioning "prudential" standing

---

distribution will not cause or exacerbate a shortage of the drug" in Canada. Gov't Br. 11–12 (quoting Interim Order Respecting Drug Shortages (Safeguarding the Drug Supply), § 2, 154 C. Gaz. Pt. I 3670, 3672 (2020) (Can.)); *see also* Gov't Br. 24 n.7. But Defendants never claim that all drugs covered by existing SIP proposals are currently in shortage in Canada, or that the interim order will prevent importation—just that it will create "uncertainty" about how importation will work. Gov't Br. 12.

doctrines). Although Courts in this Circuit have continued to apply that doctrine in certain cases, *e.g.*, *Common Cause v. Trump*, 506 F. Supp. 3d 39, 45 n.3 (D.D.C. 2010) (three-judge court), the doubt that the Supreme Court has cast on the doctrine weighs against its application here.

### B.  Plaintiffs' Claims Are Prudentially Ripe.

Even if the prudential-ripeness doctrine retains force, the doctrine does not bar Plaintiffs' challenge to the Certification and Final Rule. Prudential ripeness turns on two factors: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). Both factors weigh in favor of Plaintiffs.

### 1.  *Plaintiffs' claims are fit for judicial resolution.*

"[T]he fitness of an issue for judicial decision depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (quotation marks omitted); *see also Village of Bensenville v. FAA*, 367 F.3d 1114, 1120 (D.C. Cir. 2004) (issues "fi[t] . . . for judicial resolution" when "further factual development of the issues presented" would not be helpful). All three criteria demonstrate the fitness of Plaintiffs' claims.

*First*, Plaintiffs raise purely legal issues, which will be decided on an existing administrative record, without further fact-finding, and which do not depend on how FDA "might exercise its discretion in the future." *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 715 (D.C. Cir. 2011). Plaintiffs challenge the Certification and Final Rule as arbitrary, capricious, and contrary to law, and the D.C. Circuit has "repeatedly held that claims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (2005). Whether, for example, Section 804 allows the

HHS Secretary to certify Section 804 only with respect to commercial importation, or by allowing state programs to demonstrate the statutorily required significant reduction in the cost of products to the American consumer by instead showing savings to state programs, depends on questions of law, not the contents of particular SIP proposals. Whether the Final Rule violates Section 804 depends on the Rule and the statute, not on the contents of particular SIP proposals. Plaintiffs' claims that both the Certification and the Final Rule were arbitrary and capricious in light of the records before the agencies likewise turn on the contents of the administrative record and questions of law, not the contents of particular SIPs. And because Plaintiffs plead their First Amendment challenge as a facial challenge—i.e., because the Final Rule compels manufacturers to make certain statements regardless of whether they agree with those statements—such "a purely legal claim in the context of a facial challenge . . . is presumptively reviewable." *Nat'l Ass'n of Homebuilders*, 417 F.3d at 1282 (quotation marks omitted).

Plaintiffs' procedural claims are likewise purely legal. It is well-established that claims that an agency failed to provide notice and opportunity for comment on a rule are "purely legal." *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 215 (D.C. Cir. 2007); *see also Nat'l Ass'n of Home Builders*, 417 F.3d at 1281 (procedural claim was ripe "at the time the alleged failure occurred, i.e., when the [agency] issued the [rule] without complying with those procedures"). And the question of whether Defendants consulted with the USTR and CBP, as Section 804(b) requires, will likewise be answered by the administrative record without further factual development.

*Second*, for much the same reasons, a "more concrete factual setting" would not aid the adjudication of Plaintiffs' claims. This case presents purely legal questions, the answer to which will depend on the administrative record. Because "[r]esolution of the issue[s] requires no more factual development than that already contained in the administrative record," a "more concrete

factual setting" would not aid the Court's review. *See State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 485 (D.C. Cir. 1986); *see also, e.g.*, *CSI Aviation Servs., Inc. v. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011) ("[I]n the absence of any disputed facts that would bear on this question, our review of the agency's legal position would not benefit from a more concrete setting.").

Defendants contend that deferring review of the legality of the Certification and Final Rule until FDA has decided a specific SIP application would "bring more manageable proportions to the scope of the parties' dispute" and "address[] and further flesh[] out" Plaintiffs' claims through the administrative process." Gov't Br. 37–38 (quotation marks omitted). But Defendants fail to explain how deferring adjudication of Plaintiffs' claims would actually aid in their review. *See, e.g.*, *Wellness Pharmacy*, 2021 WL 4284567, at *13 (claim was ripe despite "some degree of factual uncertainty" regarding whether States would sign MOU with FDA because agency had "not identified any reason to delay judicial review until that uncertainty disappears completely"); *Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30, 53 (D.D.C. 2020) (rejecting HHS argument that claims were unripe because "the dispute would benefit from a more concrete setting," when HHS "never explaine[d] what 'additional factual development' [wa]s necessary to resolve the claims"). Plainly, "the context of a particular, authorized SIP" cannot "crystallize" Plaintiffs' claims that Section 804 does not allow for partial or conditional certification, or that the enactment of the Certification and Final Rule violated the APA's procedural requirements—issues entirely independent from whether FDA properly determines that a particular SIP would satisfy the Final Rule and Section 804(*l*)(2)'s safety and cost criteria. To the contrary, Plaintiffs' procedural claims "can never get riper." *Wyo. Outdoor Council v. USFS*, 165 F.3d 43, 51 (D.C. Cir. 1999) (quoting *Ohio Forestry*, 523 U.S. at 737).

*Third*, the Certification and Final Rule indisputably are final. Agency action is "final" if it "mark[s] the consummation of the agency's decision making process" and if "the action [is] one by which rights or obligations have been determined or from which legal consequences flow." *Bennett*, 520 U.S. at 178 (quotation marks omitted). Both criteria are met here. There is nothing tentative or interlocutory about either the Certification or the Final Rule, and "legal consequences flow" from both. Defendants do not contend that either action is unreviewable under the APA. *Cf.* 5 U.S.C. § 704 (allowing review of actions made reviewable by statute or "final agency action"). While Defendants maintain that FDA could "conceivably correct any mistakes" through a SIP-specific proceeding, "[t]he mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal." *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) (quoting *Sackett v. EPA*, 566 U.S. 120, 127 (2012)).

### 2.     *To the extent relevant, the hardship inquiry favors Plaintiffs.*

Because these issues are fit for judicial review, there is no need for the Court to consider whether deferring review would cause the parties hardship. *See, e.g.*, *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1310 (D.C. Cir. 2010); *see also Fla. Power & Light Co. v. EPA*, 145 F.3d 1414, 1421 (D.C. Cir. 1998) (hardship relevant when party has *not* shown fitness for judicial review); *Wellness Pharmacy*, 2021 WL 4284567, at *14 (court "need not consider the hardship prong of the ripeness inquiry" where fitness prong is satisfied).

Even if hardship were relevant to the Court's ripeness analysis, this factor too would weigh in favor of immediate judicial review. As explained above, *see supra* Section I.C., Plaintiffs' members have already been forced to incur substantial expenses preparing to meet their obligations under the Final Rule once a SIP is approved, to avoid possible civil and criminal liability should they be unable to comply with an Importer's demand within 30 calendar days. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (matter

was ripe where, without judicial resolution, plaintiffs would be forced to engage in "considerable advanced planning" and make large expenditures in the face of deep uncertainty). In that respect, the Certification and Final Rule have had and will continue to have a "direct and immediate" impact on Plaintiffs' members' "primary conduct." *See Nat'l Ass'n of Home Builders*, 417 F.3d at 1284. That hardship is "undue" because further delay is unnecessary to enable factual development of Plaintiffs' claims. Delay is especially difficult to justify here, where Plaintiffs have identified numerous legal defects in the Certification and Final Rule, any of which are sufficient to invalidate the entirety of the actions challenged here. *See* MMA § 804(*l*) (Section 804 ineffective absent certification); 21 C.F.R. § 251.20 (provisions of Final Rule inseverable, and "[i]f any provision is stayed or determined to be invalid or unenforceable, the remaining provisions shall not continue in effect"); 85 Fed. Reg. at 62,111 (explaining that the "certification rests on the authorities and requirements outlined in the regulation issued to implement section 804," the invalidation of any of which would nullify the certification, which was "based on an understanding regarding how section 804 would be implemented" that would become "factually incorrect and legally invalid" if any aspect of the Final Rule were not in force).

Indeed, no one benefits from deferring review. States and manufacturers would continue incurring substantial costs preparing for importation—costs that will be for naught when the program is ultimately held to be unlawful. And, rather than having the time to review Plaintiffs' claims in orderly fashion, this Court will be forced to decide Plaintiffs' claims on an emergency basis to prevent Plaintiffs' members from suffering irreparable harm as soon as 30 days after a SIP is approved. *See Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 144 (1974) (issues were ripe for adjudication where "delay in decision" would "create the serious risk that consideration of the validity of [the challenged] provisions may either be too hasty to afford protection of rights or too

late" to "minimize or prevent irreparable injury"); *Wellness Pharmacy*, 2021 WL 4284567, at \*14 (claim was ripe since "[d]elaying judicial consideration" until States made final decision regarding whether or not to sign MOU with FDA "would put plaintiffs in an untenable position" due to compliance costs and the "risk [of] civil and criminal penalties").  Those problems can be largely or entirely avoided by addressing Plaintiffs' legal challenges to the Certification and Final Rule now.

## III.    Plaintiffs Have Stated APA Procedural Claims.

Plaintiffs have plausibly alleged that the Certification and Final Rule were conducted "without observance of procedure required by law," in violation of Section 706(2)(D) of the APA. Specifically, Plaintiffs have adequately alleged that: (1) the Certification is a "rule" under the APA and thus Plaintiffs were deprived of notice and an opportunity for comment; (2) the SIPs likewise must, but do not, provide notice and an opportunity for comment; and (3) the HHS Secretary failed to conduct the required consultation with USTR and CBP.

### A.    Plaintiffs Properly Challenge the Certification Under the APA.

Plaintiffs have plausibly alleged that the Certification was a rule that Defendants failed to promulgate in accordance with the notice-and-comment rulemaking procedures required by the APA. *See* 5 U.S.C. § 553; AC ¶¶ 150–51. The plausibility of Plaintiffs' allegations follows from the text of the APA and from precedent.

#### 1.    *The Certification is a "rule" under the APA.*

Under the plain text of the APA, the Certification was a rule subject to notice and comment. The APA broadly defines a rule to mean, among other things, "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). The Certification meets each of these requirements: It (1) is "an agency statement"; (2) has "general or particular applicability"; and (3) "future effect"

and (4) is "designed to implement . . . or prescribe law or policy." Although the APA exempts

certain "rules" from notice-and-comment rulemaking requirements, *see* 5 U.S.C. § 553(b)(A)–(B),

these exceptions are "narrowly construed and only reluctantly countenanced," *Sentara-Hampton*

*Gen. Hosp. v. Sullivan*, 980 F.2d 749, 759 (D.C. Cir. 1992) (quotation marks omitted), and

Defendants do not contend that the Certification falls within any of these statutory exceptions, *cf.*

Gov't Br. 28–30.

The D.C. Circuit has held that a similar secretarial certification triggering application of a

law was a "rule" subject to notice and comment. In *Milk Industry Foundation v. Glickman*, 132

F.3d 1467 (D.C. Cir. 1998), the court considered a federal statute that approved an interstate

compact on milk prices, conditioned on the Secretary of Agriculture's finding of a "compelling

public interest" in approval "in the Compact region." *See* Federal Agricultural Improvement and

Reform Act of 1996 § 147, 7 U.S.C. § 7256. The Court rejected the Secretary's argument that the

finding was "merely [a] determin[ation] that conditions in the Compact region met the condition

set by Congress for implementation of the Compact," rather than agency action reviewable under

the APA, as "a distinction without a difference." 132 F.3d at 1475. As the D.C. Circuit explained,

the certification was a "rule implementing congressional policy" and thus fell within the APA's

definition of "rule."[20] Defendants do not cite *Milk Industry*, let alone explain why it does not

control here.

Defendants instead rely on *National Mining Association v. McCarthy*, 758 F.3d 243 (D.C.

Cir. 2014), which considered whether a memorandum setting out new procedures for reviewing

Clean Water Act permits was final agency action. *See* Gov't Br. 28–29. *National Mining* actually

---

[20] Because the Secretary had satisfied the procedural requirements for informal rulemaking, the
conclusion that the certification was a rule bore only on whether it was reviewable under the APA's
arbitrary-and-capricious standard. *See* 132 F.3d at 1475 (citing 5 U.S.C. § 553).

confirms that the Secretary's Certification is a legislative rule, not a mere interpretive rule or policy guidance. The court explained that "[t]he most important factor" in distinguishing legislative rules from policy statements "concerns the actual legal effect (or lack thereof) of the agency action in question." 758 F.3d at 252. The EPA memorandum in question was not a legislative rule because "as a legal matter" it was "meaningless": the guidance did "not impose any requirements in order to obtain a permit or license," and "[a]s a matter of law, state permitting authorities and permit applicants [could] ignore [the guidance] without facing any legal consequences." *Id.*

Here, by contrast, the "legal effect" of the Certification could not be clearer. The Certification activates and operationalizes an entire statute, giving legal force to statutory and regulatory provisions that "tell regulated parties what they must do or may not do in order to avoid liability" and "set[ting] forth legally binding requirements for [sponsors] to obtain" SIP approval. *Id.* at 251–52. The Certification also alters States' rights: before the Certification, a State request to import would have been summarily denied, but now, States are entitled to a review process. In other words, the Certification falls squarely within the D.C. Circuit's definition of "[a] legislative rule" as "one that has legal effect or, alternatively, one that an agency promulgates with the intent to exercise its delegated legislative power by speaking with the force of law." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020) (quotation marks omitted).[21]

Defendants' efforts to escape notice and comment by characterizing the Certification as a *sui generis* action "'in the nature of a declaratory order that clarifies FDA's position on matters

---

[21] For similar reasons, *Neustar, Inc. v. FCC*, 857 F.3d 886 (D.C. Cir. 2017), is of no help to Defendants. That case arose as a challenge to a Federal Communications Commission ("FCC") order approving the transfer of a contract for managing telephone numbers from one party to another, an "individualized determination [that] was not intended to impact law or policy," but instead to "resolve[] interests in a specific bidding competition." *Id.* at 895. The Certification, by contrast, cannot be seen *except* as broadly "impact[ing] law or policy."

presented in' 21 U.S.C. § 384" fare no better. Gov't Br. 29 (quoting 85 Fed. Reg. at 62,114). The Certification is wholly unlike a "declaratory order." Under 5 U.S.C. § 554—a provision of the APA addressing formal adjudications—agencies may issue declaratory orders to "terminate a controversy or remove uncertainty," such as by clarifying the agency's position on whether individuals or activities fall within its jurisdiction. But the Certification has legal effect—it activates an entire section of the U.S. Code and subjects Plaintiffs' members to affirmative obligations that may be enforced civilly and criminally. As the D.C. Circuit has explained, "[t]he feature which distinguishes declaratory orders and other interpretative rulings from those legislative rules which must conform with the procedures established by the APA for rulemaking is not the extent of their effect, but rather that the order or ruling instead of creating new law serves only to clarify and state an agency's interpretation of an existing statute or regulation." *Brit. Caledonian Airways, Ltd. v. C. A. B.*, 584 F.2d 982, 990 (D.C. Cir. 1978). The Certification— which creates new law—is patently not "in the nature of a declaratory order."[22]

## 2. *Plaintiffs were deprived of the opportunity for notice and comment.*

Because the Certification was a rule, it was subject to the notice-and-comment requirements of 5 U.S.C. § 553, which include a "reasonable and meaningful" opportunity to participate in the rulemaking process. *See, e.g.*, *Forester v. Consumer Prods. Safety Comm'n*, 559 F.2d 774, 787 (D.C. Cir. 1977). Defendants denied Plaintiffs and their members just such an opportunity. "Meaningful" notice and comment requires that the agency provide the public with

---

[22] Additionally, the Certification relies on facts about the safety and cost effects of importation that depend entirely on future events. As the 1947 Attorney General's Manual on the APA explained, declaratory orders were intended for use "only in conditions where the critical facts can be explicitly stated, without possibility that subsequent events will alter them." DOJ, *Attorney General's Manual on the Administrative Procedure Act* 59 (1947). Far from being "in the nature of a declaratory order," the Certification is unlike how declaratory orders were ever meant to function.

notice of all data on which the agency relies in promulgating a rule. *See United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240 (2d Cir. 1977). Here, Defendants admitted having *no* data about the safety and cost effects of the importation scheme, as the blank cost-benefit analysis table in the Final Rule attests. 85 Fed. Reg. at 62,123.

### B. Plaintiffs Plausibly Allege that the SIP Process Violates Their Procedural Rights.

Plaintiffs have also plausibly alleged that the SIP process created by the Final Rule violates their procedural rights. Defendants do not dispute that the Rule denies Plaintiffs and their members the right to prior notice or an opportunity to comment on SIP proceedings—including proceedings that would directly impose legal obligations upon them. Instead, Defendants contend that this lack of process is lawful because "a SIP authorization is *not* a rule under the APA." Gov't Br. 30. That argument fails because Plaintiffs are entitled to process, whether a SIP authorization is a rule or not.

### 1. *SIPs are rules subject to notice-and-comment.*

Section 804 requires key statutory determinations to be made through rulemaking. It provides that FDA "shall promulgate regulations" regarding drug importation, 21 U.S.C. § 384(b), and that the "regulations" shall, among other things, "require that safeguards be in place to ensure that each prescription drug imported . . . [is] safe and effective," *id.* § 384(c)(1). Defendants chose to defer these critical determinations to the SIP process, stating that the Secretary "will find that a particular SIP proposal" meets the requirement "that a SIP will pose no additional risk to the public's health and safety" "based on the information received as part of the proposal." 85 Fed. Red. 62,094, 62,112. Because the statute requires this determination to be made through rulemaking, the SIPs are rules.

SIPs also clearly meet the definition of a "rule" set forth in the APA: "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4); *cf.* 21 C.F.R. § 251.2 (defining "SIP" as "a program under section 804 . . . that has been authorized by FDA for the importation of eligible prescription drugs from Canada"). A SIP plainly has future "legal effect," and "speak[s] with the force of law." *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021). As discussed, a SIP directly imposes extensive legal obligations upon drug manufacturers, subject to civil enforcement and criminal prosecution. It also changes the legal rights of States, wholesalers, and importers by allowing the importation of drugs. *See* 21 U.S.C. § 333(b)(6); 85 Fed. Reg. at 62,103; AC ¶¶ 60, 61. A SIP, therefore, results in a "substantive regulatory change to the [FDCA's] statutory or regulatory regime," *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014), and is a rule.

Defendants nevertheless contend that a SIP is a "paradigmatic example" of an "informal adjudication" (or "order") because it "applie[s] existing rules and regulations . . . in a fact-intensive determination that occur[s] on a case-by-case basis." Gov't Br. 31 (quoting *Neustar*, 857 F.3d at 895). But unlike *Neustar* and the other examples that Defendants cite, a SIP does not impact the rights only of individual applicants "on a case-by-case basis." *Id.*; *see Int'l Internship Program v. Napolitano*, 718 F.3d 986, 987–88 (D.C. Cir. 2013) (denials of visa applications); *Hudson v. FAA*, 192 F.3d 1031, 1034, 1036 (D.C. Cir. 1999) (certification of airworthiness for particular aircraft). Instead, a SIP creates a drug importation program for the entirety of a State, broadly impacting the public as well as numerous manufacturers nationwide.

**2.      *Even if SIPs are informal adjudications, the Final Rule violates Plaintiffs' procedural rights by denying them an opportunity to participate.***

The APA guarantees "interested person[s]" the right to "appear before an agency . . . in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency

function." 5 U.S.C. § 555(b). That provision "is universally understood to establish the right of an interested person to participate in an on-going agency proceeding," including an informal adjudication. *Block v. SEC*, 50 F.3d 1078, 1085 (D.C. Cir. 1995); *see PBGC v. LTV Corp.*, 496 U.S. 633, 655 (1990) (noting that § 555 sets forth "the minimal requirements" for "informal adjudication"). And agencies cannot impose a "flat ban upon all intervention," as FDA did here. *Nichols v. Bd. of Trustees of Asbestos Workers Loc. 24 Pension Plan*, 835 F.2d 881, 897–99 (D.C. Cir. 1987); *Animal Legal Def. Fund v. Vilsack*, 237 F. Supp. 3d 15, 22 (D.D.C. 2017) (parties seeking to intervene in informal agency adjudications "must not be treated as interlopers" "[b]ecause nearly every agency decision—including those made by the agency in individual adjudications—implicates public policy").

Defendants do not deny that § 555(b) governs informal adjudications, and generally requires some process allowing interested persons to intervene. Nor do Defendants deny that Plaintiffs and their members are interested persons; they include manufacturers who will be directly subject to costly legal requirements and other injuries as a result of a SIP, as well as pharmacists and others who will be injured by SIPs that provide insufficient safeguards against unapproved, misbranded, and adulterated drugs. *See* AC ¶ 177. Defendants also fail to assert any "reasonable justification," *Nichols*, 835 F.2d at 897, as to why "the orderly conduct of public business" would not "permit[]" interested persons to participate in SIP proceedings, 5 U.S.C. § 555(b).

Instead, Defendants argue that Plaintiffs' right to participate is satisfied because interested persons can file a Citizen Petition regarding a SIP. Gov't Br. 43. But the filing of a Citizen Petition does not allow "interested person to participate in an on-going agency proceeding." *Block*, 50 F.3d at 1085. Rather, a Citizen Petition "initiate[s]" a *separate* administrative proceeding through which

persons can collaterally challenge the agency's decision "to take or refrain from taking" an action. 21 C.F.R. § 10.25(a). Because a Citizen Petition is a separate proceeding, FDA need not address it at all; instead, it could authorize a SIP first and then simply deny a Citizen Petition regarding the SIP application as moot. *See* 21 C.F.R. § 10.30(e)(2)(iii); AC ¶ 112.

Further, a Citizen Petition is no substitute for the opportunity to participate in SIP proceedings because SIP proceedings are not public. Plaintiffs and their members have only the information that States choose to publicly release; they have no means of obtaining information in a timely fashion or submitting informed Citizen Petitions when States do not choose to make their applications or amendments publicly available. AC ¶¶ 112, 176. While Plaintiffs did submit Citizen Petitions regarding the Florida and New Mexico SIPs, they have no way of knowing whether there have been non-public amendments or proceedings regarding those SIP applications, or (apart from Defendants' assertions in their brief) whether any additional, non-public SIP applications have been submitted. AC ¶¶ 112, 175.

Presumably for this reason, the agency did not contend in the preamble to the Rule that Citizen Petitions constitute an opportunity to intervene in SIP proceedings. To the contrary, FDA contended that manufacturers and others are *not* "entitled to participate in FDA's review of the SIP Proposal." 85 Fed. Reg. at 62,121. The preamble suggests that a Citizen Petition can be used after FDA creates a SIP, "to petition FDA with regard to, or seek a stay of, the authorization of a SIP." *Id.* at 62,122. But the ability to collaterally challenge a decision the agency has made is not the same as an "opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas." *New Jersey*, 626 F.2d at 1049; *see N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 18 (D.D.C. 2009) ("[P]ermitting the submission of views after the effective date of a regulation is no substitute for

the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way." (quoting *Block*, 655 F.2d at 1158)).

Because the Rule precludes their participation in SIP proceedings, Plaintiffs have plausibly alleged that FDA's black-box SIP review process violated their members' rights under § 555(b). *See Nichols*, 835 F.2d at 899 (stating that right to "intervene" under APA § 555(b) "at minimum requires agency action designed to accommodate the legitimate interests of would-be intervenors with the need for orderly administrative processes").

### C.    Plaintiffs Properly Challenge Defendants' Failure to Consult with Other Officials.

Finally, Plaintiffs have plausibly alleged that Defendants failed to consult with the USTR and CBP before issuing the Final Rule. Defendants do not dispute that the failure to consult with USTR and CBP as Section 804(b) requires violates the APA. *See Am. Fuel & Petrochem. Mfrs. v. EPA*, 937 F.3d 559, 592 (D.C. Cir. 2019) (failure to engage in interagency consultation was "archetypal procedural injury"). Instead, Defendants argue for two reasons that Plaintiffs simply have not pleaded an APA procedural violation.

*First*, Defendants contend that Plaintiffs have not alleged facts that raise a plausible inference that the HHS Secretary failed to consult with the USTR and CBP as Section 804(b) requires. Gov't Br. 33. That argument strains credulity. Although the Final Rule acknowledges this consultation requirement, 85 Fed. Reg. at 62,096, it makes no mention whatsoever of Defendants' having complied with this obligation. AC ¶ 58. Nor have Plaintiffs uncovered any evidence to suggest that these consultations actually took place. AC ¶ 180. The docket for the Final Rule does not reflect any evidence of consultations. *Cf.* FDA, Docket Details:  Documents, No. 2019-5711,   https://www.regulations.gov/docket/FDA-2019-N-5711.   Multiple   Freedom   of Information Act ("FOIA") requests submitted by PhRMA's counsel, all of which were pending at

the time the Amended Complaint was filed, have not generated any documents related to any such consultation. *Cf.* AC ¶ 58 n.24. Instead, HHS responded to a FOIA request stating that it has no records of consultation with the USTR and CBP, and the USTR similarly responded that it lacked records of a consultation with HHS. *See* Covington Decl. ¶¶ 9–14, 26–29.[23] In short, Plaintiffs have more than "plausibly" alleged that the consultation never took place. While Defendants' respond that the Secretary's conduct is entitled to a "presumption of regularity," "that presumption is not to shield his action from a thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (quotation marks omitted), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

*Second*, Defendants argue that Plaintiffs have not explained how such a procedural failure harmed their or their members' concrete interests. Gov't Br. 33. But it is clear from the Amended Complaint how Plaintiffs' "concrete and particularized interests would have been affected by any failure to consult with the [USTR and CBP]." *Cf.* Gov't Br. 33. Plaintiffs object to importation on the grounds that, among other things, it (1) conflicts with the United States' international trade obligations, *e.g.*, AC ¶¶ 158, 160; and (2) increases the risk that adulterated and counterfeit drugs will be transported across the United States' borders, *e.g.*, AC ¶ 66. As Plaintiffs alleged, *id.* ¶ 58 n.24, PhRMA raised in its comment to the proposed rule the need for the HHS Secretary to consult with the USTR and CBP. PhRMA's comment describes the significant impacts on international trade and the quality of pharmaceutical treatments in the United States of the proposed rule.[24]

---

[23] Because Defendants have attacked Plaintiffs' standing to assert their consultation claim, Plaintiffs are entitled to adduce additional affidavits in support of standing, and the Court may consider those affidavits without converting Defendants' motion to dismiss into a motion for summary judgment. *See Haase*, 835 F.2d at 905–07.

[24] *See* PhRMA, Comment Letter on Importation of Prescription Drugs Proposed Rule, FDA Dkt. 2019-N-5711 (Mar. 9, 2020), https://downloads.regulations.gov/FDA-2019-N-5711-1236/attachment_1.pdf.

Particularly in light of the rule that "all reasonable inferences" must be drawn "in the plaintiffs' favor," *see, e.g.*, *Humane Soc'y v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015), it requires no leap of logic to infer that consulting with the officials with primary responsibility for managing the United States' international trading relationships and preventing the flow of unapproved drugs into the United States could have led Defendants to authorize importation only on narrower grounds, or to scrap the scheme entirely.

**CONCLUSION**

Plaintiffs have standing to challenge the Certification and the Final Rule. Plaintiffs' procedural and substantive challenges to those final agency actions are ripe for review. This Court should deny Defendants' motion to dismiss, order Defendants promptly to produce the Administrative Record, and set this matter for resolution of the merits on cross-motions for summary judgment.

Respectfully submitted,

/s/ Constantinos G. Panagopoulos

Constantinos G. Panagopoulos
(D.C. Bar. No. 430932)
BALLARD SPAHR LLP
1909 K Street NW #1100
Washington, DC 2005
Tel: (202) 661-2200
Fax: (202) 661-2299
cgp@ballardspahr.com
*Counsel for Partnership for Safe*
*Medicines*

Aliza R. Karetnick (*pro hac vice*)
Laura E. Gavin (*pro hac vice*)
BALLARD SPAHR LLP
1735 Market Street, Floor 51
Philadelphia, PA 19103
Tel: (215) 864-8367
Fax: (215) 864-8999
karetnicka@ballardspahr.com
gavinl@ballardspahr.com

*Counsel for Partnership for Safe*
*Medicines*

/s/ Robert A. Long, Jr.

Robert A. Long, Jr. (D.C. Bar No. 415021)
Benjamin C. Block (D.C. Bar No. 47905)
Julie Dohm (D.C. Bar No. 1660119)
Thomas Brugato (D.C. Bar No. 1013523)
COVINGTON & BURLING LLP
One City Center
850 10th Street, NW
Washington, D.C. 20001
Tel: (202) 662-6000
Fax: (202) 662-6302
rlong@cov.com
bblock@cov.com
jdohm@cov.com
tbrugato@cov.com

*Counsel for Pharmaceutical Research and*
*Manufacturers of America*

/s/ Sean C. Griffin

Sean C. Griffin (D.C. Bar No. 499537)
Rebecca K. Wood (D.C. Bar No. 473616)
Erika L. Maley (D.C. Bar No. 1008714)
Daniel J. Hay (D.C. Bar No. 1047969)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel.: (202) 736-8000
Fax: (202) 736-8711
sgriffin@sidley.com
rwood@sidley.com
emaley@sidley.com
dhay@sidley.com

*Counsel for Council for Affordable Health*
*Coverage*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 30, 2021, I caused the foregoing document to be filed with the Clerk of the Court of the United States District Court for the District of Columbia using the Court's CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Benjamin C. Block*
Benjamin C. Block