**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PHARMACEUTICAL RESEARCH & MANUFACTURERS OF AMERICA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> *Defendants*. | Case No. 1:20-cv-3402-TJK |

**BRIEF OF INNOVATIVE MEDICINES CANADA
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS**

Declan Hamill
Vice President
Policy, Regulatory and Legal Affairs
Innovative Medicines Canada
1220-55 Metcalfe Street
Ottawa, ON, K1P 6L5
(613) 236-0455 ext 425
dhamill@imc-mnc.ca

Karen C. Corallo (DC Bar No. 219249)
Paul M. Kerlin (DC Bar No. 993243)
Amanda H. Chan (DC Bar No. 1617305)
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue NW
Washington, D.C. 20005
(202) 371-7000
Karen.Corallo@skadden.com
Paul.Kerlin@skadden.com
Amanda.Chan@skadden.com

*Counsel for Amicus Innovative Medicines Canada*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTEREST OF *AMICUS CURIAE* ...................................................................................1

INTRODUCTION ..............................................................................................................1

ARGUMENT .....................................................................................................................3

    I.      IMPORTATION WILL PUT U.S. CONSUMERS AT RISK ................................3

         A.      There Is Insufficient Regulatory Oversight Over SIPs .............................3

         B.      SIPs Will Flood The United States With Illicit Drugs ...............................6

              1.      The Canadian Drug Supply Cannot Meet Heightened
                      Demand Under SIPs .................................................................6

              2.      SIPs Will Exacerbate The Problem Of Drug Shortages In
                      Canada ......................................................................................7

              3.      SIP-Caused Drug Shortages Will Promote The Sale Of
                      Illicit Drugs And Influx Of These Drugs Into The United
                      States .......................................................................................9

         C.      SIPs Will Interfere With The Tightly Controlled Drug Distribution
             System In The United States ....................................................................11

    II.     ANY COST SAVINGS TO U.S. CONSUMERS INTENDED BY THE
         FINAL RULE WOULD BE MINIMAL AT BEST ..............................................14

    III.    THE SIP PROCESS DENIES INTERESTED STAKEHOLDERS THE
         OPPORTUNITY TO PARTICIPATE IN AND COMMENT ON SIP
         PROCEEDINGS ..................................................................................................16

CONCLUSION .................................................................................................................17

## **TABLE OF AUTHORITIES**

**Page(s)**

### **LEGISLATIVE MATERIALS**

New Mexico Department of Health, *Report and Recommendation of Hearing Officer on Dec. 2, 2020: Public Hearing on Proposed Wholesale Drug Importation Program* (Dec. 10, 2020) ...............................................................................................................15

### **OTHER AUTHORITIES**

Best Medicines Coalition, *Comment to Docket No. FDA-2019-N-5711, Notice of Proposed Rulemaking: Importation of Prescription Drugs* (Mar. 9, 2020) ...............12, 13

Canadian Pharmacists Association, *Comment to Docket No. FDA-2019-N-5711, Notice of Proposed Rulemaking: Importation of Prescription Drugs* (Mar. 9, 2020) .....................13

Carmen A. Catizone, *Letter to U.S. Congress Stating Position on Canadian Online Pharmacies Dispensing to U.S. Patients*, NABP (Feb. 10, 2017).....................................10

Connect2Canada, *Readout of Acting Ambassador Kirsten Hillman's Meeting with Joe Grogan Assistant to the President for Domestic Policy* (Nov. 1, 2019)...........................15

Department of Health and Human Services Task Force on Drug Importation, *Report on Prescription Drug Importation* (Dec. 2004)............................................................. passim

Drug Shortages Canada (last visited Oct. 6, 2021)..........................................................................8

*Final Rule on Importation of Prescription Drugs*, 85 Fed. Reg. 62,094 (Oct. 1, 2020)....................................................................1, 3, 12, 16

Government of Canada, *Comment to Docket No. FDA-2019-N-5711, Notice of Proposed Rulemaking: Importation of Prescription Drugs* (Mar. 10, 2020)................................4, 15

Government of Canada, *Explanatory note for safeguarding drug supply interim order* (Nov. 28, 2020)..............................................................................................................8

Government of Canada, *Regulations Amending Certain Regulations Concerning Drugs and Medical Devices (Shortages)*, SOR/2021-199, Canada Gazette, Part II, Volume 155, Number 18 (Sept. 1, 2021)........................................................................5, 9

Government of Canada, *Regulations Amending the Food and Drug Regulations (Exports and Transhipments of Drugs)*, Regulatory Impact Analysis Statement, Canada Gazette, Part I, Volume 155, Number 24 (June 12, 2021)....................................................6

Health Canada, *Interim Order Respecting Drug Shortages (Safeguarding the Drug Supply)* (Nov. 28, 2020).................................................................................5

Jessy Donelle et al., *Assessing Canada's Drug Shortage Problem* (June 5, 2018).........................9

Marv Shepherd, *New pathways for U.S. importation threaten Canadian prescription drug supply* (Sept. 23, 2019) ...................................................................................7

*Notice of Proposed Rulemaking on Importation of Prescription Drugs*, 84 Fed. Reg. 70,796 (Dec. 23, 2019).........................................................10, 11

Patent Act, R.S.C. 1985, c. P-4, s.83 (Canada)...........................................................14

Statistics Canada, *Quarterly Population Estimate* (July 1, 2021) .......................................6

The Multi-Stakeholder Steering Committee on Drugs Shortages in Canada, *Protocol for the Notification and Communication of Drug Shortages* (revised 2017) ...........................8

U.S. Census Bureau, *Explore Census Data* (last visited Oct. 6, 2021) ...........................7

U.S. Census Bureau, *Quick Facts: Florida* (July 2019).................................................7

U.S. Census Bureau, *U.S. Population* (last visited Oct. 6, 2021) ...................................7

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* is Innovative Medicines Canada ("IMC"), the leading trade organization representing Canada's research and development pharmaceutical industry.  IMC has 47 member companies ranging from established organizations to start-ups.  All are dedicated to improving patient health through the development of safe and effective medicines and vaccines.  IMC has a profound interest in and commitment to both the safety and integrity of the Canadian drug supply and medicines exported to the United States from Canada.

IMC has unique insight on the dynamics of the Canadian prescription drug market. Importation of Canadian drugs under the Final Rule, which implements section 804 of the Federal Food, Drug, and Cosmetic Act ("FDCA") through programs sponsored by states or Indian Tribes, will put U.S. consumers at risk and fail to deliver significant cost savings—the two express requirements of the Final Rule.  Instead, importing prescription drugs into the United States from Canada will lead to diminished supply and drug shortages in Canada and compromise the safety and availability of medicines in both the Canadian and U.S. drug markets.

## INTRODUCTION

The Final Rule has a two-pronged purpose: to "pos[e] no additional risk to the public's health and safety" while achieving a "significant reduction in the cost of covered products to the American consumer."[2]  Neither goal is served by the government's embrace of section 804 importation programs ("SIPs").

---

[1] No person other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

[2] *Final Rule on Importation of Prescription Drugs*, 85 Fed. Reg. 62,094, 62,094 (Oct. 1, 2020) ("Final Rule").

1

First, as discussed below, SIPs will endanger U.S. consumers because protective measures designed to ensure the safety, quality, and authenticity of prescription drugs for Canadian consumers are different from those that govern prescription drugs sold in the United States leading to a patchwork of regulations applying to drugs imported under SIPs.  In addition, due to the global nature of Canada's drug supply, and as a result of the limited capacity to ramp up domestic manufacturing, the Canadian pharmaceutical industry lacks the ability to meet the resulting demand from U.S. consumers, risking access for Canadian consumers and creating conditions in which illegal, adulterated, and contaminated drugs can proliferate.  These consequences threaten the security of the tightly regulated drug distribution systems in the United States and Canada.

Second, the risks of unsafe drugs entering the supply chain eclipse any potential cost savings—savings expected to be meager or non-existent under SIPs.  Canadian price controls do not apply to medicines exported from Canada, and differences between the U.S. and Canadian drug markets further undermine the potential for cost savings under SIPs.  Even if SIPs were able to deliver on the promise of getting safe drugs to U.S. patients at less cost, it has not been demonstrated that any savings will accrue.

Finally, IMC is an interested stakeholder in the SIP process, but is currently denied the opportunity to participate in or comment on the SIP process and to address the unique requirements of any individual SIP, including how those requirements bear on safety and cost saving considerations set forth in this brief.  IMC shares Plaintiffs' concerns that the SIP process violates procedural rights of interested stakeholders to participate in SIP proceedings if they so choose.

2

Implementation of SIPs will not serve the public interest, nor will it meet the drug safety or cost savings requirements of the Final Rule.  Rather, the likely harm to Canadian and U.S. patients from a compromised drug supply chain outweighs any speculative cost savings under the Final Rule.

## ARGUMENT

## I.      IMPORTATION WILL PUT U.S. CONSUMERS AT RISK

The current regulatory systems of the U.S. Food and Drug Administration ("FDA") and Health Canada, Canada's national drug safety regulator, are distinct with no formal coordination between these government agencies to assure the safety and security of drugs imported from Canada for U.S. consumers under SIPs.  Importation will facilitate the introduction of unapproved, substandard, or counterfeit drugs into the U.S. pharmaceutical market.  It will also interfere with the tightly controlled drug distribution system in the United States.

### A.      There Is Insufficient Regulatory Oversight Over SIPs

The existing regulatory frameworks of FDA and Health Canada were not designed to guarantee the safety of drugs imported under SIPs.  FDA does not have clear jurisdiction over certain foreign entities likely to be involved in the lengthy, cross-border supply chain that SIPs require—an uncertainty that undermines FDA's ability to enforce critical SIP requirements.  For example, the Final Rule broadly defines "manufacturer" to include parties with no clear nexus to the United States.[3]  This lack of nexus casts doubt on FDA's jurisdiction over these entities and its ability to enforce section 804 requirements.  Lack of jurisdiction will impede or preclude the

_____

[3] Final Rule at 62,127.

3

agency's ability to investigate quality issues from foreign manufactures and hold parties accountable through compliance remediation, recalls, fines, and other enforcement actions.

The Department of Health and Human Services Task Force on Drug Importation ("HHS Task Force") recognized the potential limitations in FDA's jurisdiction and the challenges this would pose to assuring the safety and quality of imported drugs.  To address this concern, the HHS Task Force recommended formal cooperation between the United States and exporting countries through Memoranda of Understanding ("MOU").  Under an MOU, the government of an exporting country "could agree to ensure that products from their country destined for the U.S. meet certain safety standards."[4]   Such MOUs would be critical "to ensure effective enforcement, such as agreement that the U.S. government can inspect entities in the foreign country."[5]

No such MOU addressing SIP oversight exists between the United States and Canada. Nor is Canada likely to enter into one given its public opposition to SIPs based on the risks such importation would cause to patients and the Canadian pharmaceutical supply.  The Government of Canada submitted a comment in opposition to the notice of proposed rulemaking and pledged to "employ all necessary measures to safeguard its drug supply and preserve access for Canadians to needed prescription drugs."[6]  After issuance of the Final Rule, the Canadian government then passed an Interim Order imposing temporary restrictions on Canadian entities

---

[4] HHS Task Force, *Report on Prescription Drug Importation* at 62 (Dec. 2004) ("HHS Task Force Report").

[5] *Id.* at 41.

[6] Government of Canada, *Comment to Docket No. FDA-2019-N-5711, Notice of Proposed Rulemaking: Importation of Prescription Drug* at 3 (Mar. 10, 2020).

from participating in the U.S. importation program.[7]  The restriction contained in the Interim Order has since been codified into Canada's permanent regulatory framework and prevents distribution of a drug outside of Canada if distribution can cause or exacerbate a drug shortage.[8] However, this measure's effectiveness in mitigating drug shortages in Canada remains untested, and the Government of Canada acknowledges that Canadian drugs may still be exported to the United States notwithstanding the restriction.[9]  Lack of support by Canadian authorities and uncertainty around FDA's jurisdiction undermine the viability of SIPs to provide safe imported medicines to American consumers.

Nothing in the Final Rule guarantees that Canada will assume responsibility to assure the safety of drugs imported into the United States from a foreign seller.  Health Canada is on record that it "does not assure that products being sold to U.S. citizens are safe, effective, and of high quality, and does not intend to do so in the future."[10]  The lack of regulatory oversight over medicines imported from Canada under SIPs poses a threat to the health and welfare of American consumers.

---

[7] Health Canada, *Interim Order Respecting Drug Shortages (Safeguarding the Drug Supply)* (Nov. 28, 2020).

[8] Government of Canada, *Regulations Amending Certain Regulations Concerning Drugs and Medical Devices (Shortages)*, SOR/2021-199, Canada Gazette, Part II, Volume 155, Number 18 (Sept. 1, 2021).

[9] *Id.*  ("The prohibition is limited and only applies to certain drugs that are in shortage, or at risk of being in shortage. If an organization determines that selling their product will not cause or exacerbate a shortage in Canada, the organization is able to sell that drug outside of Canada.")

[10] HHS Task Force Report at 60-61.

**B.      SIPs Will Flood The United States With Illicit Drugs**

 SIPs will endanger the safety of U.S. consumers by encouraging the introduction of

unapproved, substandard, or counterfeit drugs into the United States.  Heightened demand for

Canadian medicines cannot be met by increasing output by Canadian manufacturers, and such

demand will exacerbate ongoing shortages in Canada.  The limited supply of Canadian drugs to

meet Canadian and U.S. demand will create conditions ripe for the introduction of illicit drugs

into the United States.

1.      The Canadian Drug Supply Cannot Meet Heightened Demand Under
        SIPs

Canadian manufacturers do not have the manufacturing bandwidth to meet increased

drug demand under SIPs.  The Canadian pharmaceutical industry produces approximately 4% of

the global drug supply.[11]  Therefore, Canada, like many countries, largely relies on global

sources to serve Canada's population of 38.2 million.[12]  Reliance on the global supply chain

under ordinary circumstances can pose challenges in ensuring that Canada will have access to

prescription medicines to meet the needs of Canadian patients.  The amount of the global supply

allocated to Canada is reflective of its small market size, and the ability to secure additional

supply when demand varies is challenging.  Canada is not equipped to support increased demand

---

[11] Government of Canada, *Regulations Amending the Food and Drug Regulations (Exports and Transhipments of Drugs)*, Regulatory Impact Analysis Statement, Canada Gazette, Part 1, Volume 155, Number 24 (June 12, 2021).

[12] Statistics Canada, *Quarterly Population Estimate* (July 1, 2021), https://www.statcan.gc.ca/eng/subjects-start/population_and_demography (last visited Oct. 6, 2021).

from a U.S. population nearly nine times its size.[13]  Florida's growing population of 21.5 million people alone is roughly 56% of the Canadian population.[14]  And the combined population of just the six states, including Florida, that have proposed or are developing SIPs under the Final Rule is roughly 86% of the Canadian population.[15]  The Canadian pharmaceutical sector does not have the capacity to ramp up production to meet heightened demand from SIPs.

A recent study published in Canadian Health Policy examined the potential impact of U.S. importation on the Canadian drug supply.  The study found that the 2018 Canadian prescription drug supply would only last approximately 165 days if Canada absorbed 20% of the U.S. demand for prescription drugs and only 118 days if Canada absorbed 40% of that demand.[16] The SIP framework to import cheaper Canadian drugs to address the high cost of prescription drugs in the United States is not sustainable.

 2. SIPs Will Exacerbate The Problem Of Drug Shortages In Canada

Bulk importation of drugs under SIPs will cause Canada's drug supply situation to worsen.  Approximately 10-15% of Canadian drugs have been in shortage at "any given time"

---

[13] U.S. Census Bureau, *U.S. Population*, https://www.census.gov/popclock/ (last visited Oct. 6, 2021).

[14] U.S. Census Bureau, *Quick Facts: Florida* (July 2019), https://www.census.gov/quickfacts/FL (last visited Oct. 6, 2021).

[15] As of Oct. 6, 2021, the populations of Colorado, Maine, New Hampshire, New Mexico, and Vermont are 5.8 million, 1.4 million, 1.4 million, 2.1 million, and 0.6 million, respectively.  *See* U.S. Census Bureau, *Explore Census Data*, https://data.census.gov/cedsci (last visited Oct. 6, 2021).

[16] Marv Shepherd, *New pathways for U.S. importation threaten Canadian prescription drug supply*, Canadian Health Policy at 1 (Sept. 23, 2019), https://www.safemedicines.org/wp-content/uploads/2019/09/CHPI-Drug-Importation-Published-Article-Shepherd-SEPT2019-EN-2.pdf.

since 2017.[17]  The Canadian drug shortages database currently reports 1,416 drug shortages along with 38 additionally anticipated drug shortages.[18]  This situation has worsened as a result of the COVID-19 public health emergency.

Late last year, the Government of Canada reported that as of October 20, 2020, Canada had already experienced 42 Tier 3 shortages—more than four times the total number of Tier 3 shortages experienced in all of 2019—due to COVID-19.[19]  Tier 3 classification is reserved for drug shortages that have the "greatest potential impact on the Canadian drug supply and health care systems" due to the limited availability of alternative supplies, ingredients, or therapies.[20]

Reliance on Canada's limited drug supply to meet consumer demand in the United States will increase the severity of drug shortages in Canada.  For example, nearly 40% of the medications that Florida intends to import under its SIP have experienced shortages in Canada within the last four years.  Among the drugs identified in Florida's SIP proposal, 25 out of 51 psychiatric drugs, 5 out of 9 diabetes drugs, 4 out of 13 asthma and chronic obstructive pulmonary disease drugs, and 5 out of 25 HIV/AIDS drugs have had actual or anticipated shortages reported to Canada's drug shortage database.  Moreover, many of these drugs are associated with multiple shortages.  Metformin (1000 mg), which is used to treat type 2 diabetes,

---

[17] Government of Canada, *Explanatory note for safeguarding drug supply interim order* (Nov. 28, 2020), https://www.canada.ca/en/health-canada/services/drugs-health-products/compliance-enforcement/importation-exportation/interim-order-drug-shortages-protecting-supply/note.html/ ("Interim Order Explanatory Note").

[18] Drug Shortages Canada, *Summary Report*, https://www.drugshortagescanada.ca/rws-search?perform=1 (last visited Oct. 6, 2021).

[19]  Interim Order Explanatory Note.

[20] The Multi-Stakeholder Steering Committee on Drugs Shortages in Canada, *Protocol for the Notification and Communication of Drug Shortages* at 7 (revised 2017), https://www.drugshortagescanada.ca/files/MSSC_Protocol_2017.pdf.

was reported to be in shortage five times in 2019 and twice in 2021.  Aripiprazole (20 mg),
which is used to treat schizophrenia, was reported to be in shortage twice in 2018, once in 2019,
and three times in 2020.  Bulk importation under SIPs will further undermine the ability of
Canadian patients to access these critical, life-saving drugs.

Drug shortages can have far-reaching consequences to Canada's health care system.  The
Government of Canada explains that drug shortages "pose risks to the health and safety of
Canadians as a result of compromised or delayed medical procedures, medication errors, and
substitutions with alternative treatments that are not as safe or that are less effective."[21]
Similarly, a recent report by the C.D. Howe Institute assessing Canada's drug shortage problem
notes that drug shortages may lead to "delayed treatments and surgeries" and "illness and even
premature death" for patients, "time-consuming and often frustrating searches for alternative[]"
therapies by pharmacists and health care teams, and increased health care expenditures for
governments.[22]  SIPs therefore present a serious risk to the health and safety of Canadian patients
by increasing the risk of drug shortages.

3.    SIP-Caused Drug Shortages Will Promote The Sale Of Illicit Drugs
      And Influx Of These Drugs Into The United States

Heightened demand for Canadian drugs under the Final Rule coupled with limited supply
will inevitably fuel the growth of illegal online pharmacies targeting U.S. consumers.  The

---

[21] Government of Canada, *Regulations Amending Certain Regulations Concerning Drugs and Medical Devices (Shortages)*, SOR/2021-199, Canada Gazette, Part II, Volume 155, Number 18 (Sept. 1, 2021).

[22] Jessy Donelle et al., *Assessing Canada's Drug Shortage Problem*, C.D. Howe Institute, at 1 (June 5, 2018), https://www.cdhowe.org/sites/default/files/attachments/research_papers/mixed/Commentary_515.pdf.

dangers of these illegal online pharmacies and their sale of unapproved, substandard, or counterfeit drugs is well-documented.  For example, in 2018, "Canada Drugs," an online pharmacy purporting to sell Canadian drugs at a discount to U.S. consumers, was found to have distributed counterfeit cancer drugs containing no active ingredient into the United States.[23]

Reliance on subpotent drugs poses grave dangers to patients.  In February 2017, the National Association of Boards of Pharmacy ("NABP") reviewed 11,000 online pharmacies, finding that 96% of these online pharmacies were "operating illegally, out of compliance with state and federal laws and/or NABP patient safety and pharmacy practice standards" and "dispense[d] medications that are approved by neither FDA nor Health Canada."[24]  HHS has also acknowledged that "drugs promoted as being from Canada or approved by Health Canada . . . in many instances are not actually from Canada and not approved by [Health Canada]"; instead, these drugs actually flow from "ever-evolving illicit sources of supply."[25]  These risks will only increase under this importation scheme.

HHS acknowledges that these risks are real by providing only time-limited SIP authorizations.  This is essentially a probationary period to evaluate the health and safety risks expected from these programs.  HHS explains that "SIPs should terminate after 2 years unless re-authorized because importation under section 804 is novel," and the two-year period will

---

[23] *Notice of Proposed Rulemaking on Importation of Prescription Drugs*, 84 Fed. Reg. 70,796, 70,800 (Dec. 23, 2019) ("NPRM").

[24] Carmen A. Catizone, *Letter to U.S. Congress Stating Position on Canadian Online Pharmacies Dispensing to U.S. Patients*, NABP at 1 (Feb. 10, 2017), https://nabp.pharmacy/wp-content/uploads/2016/07/Letter-to-Congress-re-Canadian-Online-Pharmacies-2-10-17-final.pdf.

[25] NPRM at 70,800.

"provide sufficient time for SIP Sponsors to demonstrate that they can in fact import drugs from Canada with no additional risk to the public's health and safety."[26]  In particular, HHS suggests it will use this time to verify whether the novel and untested safeguards in the Final Rule are "working" and collect data on "whether and how bad actors respond to section 804 importation."

These measures, however, do nothing to protect U.S. patients, who will be prejudiced by unsafe drugs during the two-year probationary period.  Waiting to see whether consumers are harmed by unsafe medicines imported under SIPs is an approach that demands too high a price. As the HHS Task Force has cautioned, the U.S. system of drug regulation "should be modified only with great care to ensure continued high standards of safety and effectiveness of the U.S. drug supply."[27]  That is not the case here.

### C.    SIPs Will Interfere With The Tightly Controlled Drug Distribution System In The United States

SIPs will disrupt the highly regulated and tightly controlled drug distribution system in the United States.  As Plaintiffs explain in their brief, "[t]his closed system is critical to ensuring that the drugs American patients receive will be safe, effective, and of high quality."[28] Companies involved in the manufacture and distribution of pharmaceuticals to U.S. patients must follow strict record-keeping and other requirements that allow FDA to monitor distribution of a drug product from the manufacturing floor, through distribution, to dispensing by a pharmacist to the ultimate consumer.  When safety or quality issues arise, entities in the supply chain can

---

[26] NPRM at 70,810-11.

[27] HHS Task Force Report at XII.

[28] Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss at 3.

11

locate the specific lot or batch and issue appropriate notice to end users in the event of a product recall.

SIPs will interfere with this closed distribution system by allowing drugs into the United States that have been handled by multiple, foreign parties who—despite playing a critical role in manufacturing or distribution—may not be subject to FDA's jurisdiction.[29]  The Final Rule requires that "each supply chain under a SIP must be limited to three entities, *i.e.,* one manufacturer, one Foreign Seller, and one Importer."[30]  However, the realities of global pharmaceutical manufacturing and distribution defy such over-simplification.

The majority of prescription drugs sold in Canada are produced by non-Canadian manufacturers with global supply chains.  The Best Medicines Coalition ("BMC"), an alliance of 28 patient organizations focused on access to safe and effective medicines for Canadians, estimates that "70 per cent of prescription drugs allocated for Canada are manufactured elsewhere."[31]  For those prescription drugs manufactured in Canada, approximately 90% of pharmaceutical ingredients incorporated into those products are supplied by foreign entities.[32]

This means that packaging, repackaging, and distribution of basic raw materials can involve multiple points of origin.  Both intermediate and finished drug products are typically manufactured in many countries.  Drugs change hands multiple times between manufacturer and patient, and every transaction is an opportunity for falsified or substandard products to infiltrate

---

[29] *See supra* pp. 3-5.

[30] Final Rule at 62,094.

[31] BMC, *Comment to Docket No. FDA-2019-N-5711, Notice of Proposed Rulemaking: Importation of Prescription Drugs* at 2 (Mar. 9, 2020).

[32] *Id.*

the market.  Opening the closed drug distribution system in the United States through SIPs will lead to a system where lack of traceability and accountability undermine efforts to protect the quality of imported drugs.

The global supply chain will only increase in risk and complexity under SIPs with the involvement of additional foreign sellers, importers, relabelers, repackagers, and other downstream entities that will handle the product before it reaches the U.S. consumer.  BMC warns that SIPs will "increase opportunities for criminal elements to exploit loopholes, replacing bona fide medicines with counterfeits."[33]  The Canadian Pharmacists Association ("CPhA"), representing more than 43,000 pharmacists, concurs that the numerous "touchpoints for any given drug on its journey to American patients, from the foreign seller to the importer to the laboratory and repackager" each represent "an opportunity for bad actors to access and manipulate the drug supply en route to the U.S."[34]

A cross-border supply chain involving various distinct entities with separate, non-overlapping functions means that no single entity will have a comprehensive record of product manufacturing, testing, and handling should patient safety issues arise in the United States.  This will make it virtually impossible for FDA and SIP sponsors to verify the safety and authenticity of an imported drug or thoroughly investigate the matter after the fact.

Increased U.S. demand for Canadian drugs also increases the risk that drugs purportedly from Canada will be transshipped from parts unknown.  Transshipped drugs are imported into Canada for the sole purpose of export to the United States.  While these drugs are not of

---

[33] *Id.*

[34] CPhA, *Comment to Docket No. FDA-2019-N-5711, Notice of Proposed Rulemaking: Importation of Prescription Drugs* at 4 (Mar. 9, 2020).

13

Canadian origin, they may be (and often are intended to be) misunderstood by a consumer to be safe Canadian drugs. The HHS Task Force has expressed concern about the authenticity and safety of products that are transshipped and previously held that a "safe distribution system cannot exist when transshipment occurs because the source of the drugs and the integrity of the drugs are called into question."[35] Under SIPs, however, transshipped drugs are likely to proliferate to fill the void created by U.S. demand for ostensibly Canadian drugs under SIPs.

## II.   ANY COST SAVINGS TO U.S. CONSUMERS INTENDED BY THE FINAL RULE WOULD BE MINIMAL AT BEST

The importation of Canadian drugs will yield minimal, if any, cost savings to U.S. consumers. First, Canadian drug pricing controls will not apply to drugs exported from Canada for sale in the United States. The Patented Medicine Prices Review Board ("PMPRB") regulates the prices of patented drugs sold in the Canadian market. Canada's Patent Act allows for PMPRB to intervene when it finds that a patented drug is being sold "***in any market in Canada*** at a price that, in the Board's opinion, is excessive" (emphasis added).[36] If PMPRB finds that the drug is sold at an excessive price in any market in Canada, then PMPRB may issue an order directing the patentee to "reduce the price at which the rights holder sells the medicine in any market in Canada."[37]

Similarly, other cost containment measures employed in Canada will not apply to drugs imported and sold in the United States. For example, negotiations undertaken by the pan-

---

[35] HHS Task Force Report at 43.

[36] Patent Act, R.S.C. 1985, c. P-4, s.83 (Canada).

[37] *Id.*

Canadian Pharmaceutical Alliance ("pCPA"), which leverages the "collective buying power of federal, provincial and territorial governments to negotiate lower prices on brand name drugs and set price limits for generic drugs for Canada's public drug plans," will not restrict the prices of drugs exported from Canada for sale in the United States because these drugs are not being offered through Canada's public drug plans.[38]  This cost control mechanism, and others like it, are limited in their application to Canada and have no bearing on the cost of drugs exported from Canada for sale in the United States.

Second, cost savings are unlikely to materialize under SIPs due to differences between the Canadian and U.S. drug markets.  As Canada's Ambassador to the United States Kirsten Hillman explained, Canada's pharmaceutical market is "too small to have any real impact on U.S. drug prices" and represents a mere "2% of global pharmaceutical consumption" in contrast to the 44% represented by the United States.[39]  Testimony by a representative of the Canadian Society of Hospital Pharmacists ("CSHP") at a December 2020 hearing before a state health department suggests that any price differences between U.S. and Canadian drugs will likely disappear if Canadian drugs are imported under SIPs due to differences in the size of the U.S. and Canadian markets.[40]  Even the HHS Task Force expressed doubt as to whether drug

---

[38] *See* Government of Canada, *Comment to Docket No. FDA-2019-N-5711, Notice of Proposed Rulemaking: Importation of Prescription Drugs* at 2 (Mar. 10, 2020).

[39] Connect2Canada, *Readout of Acting Ambassador Kirsten Hillman's Meeting with Joe Grogan Assistant to the President for Domestic Policy* (Nov. 1, 2019), https://connect2canada.com/2019/11/readout-of-acting-ambassador-kirsten-hillmans-meeting-with-joe-grogan-assistant-to-the-president-for-domestic-policy/.

[40] New Mexico Department of Health, *Report and Recommendation of Hearing Officer on Dec. 2, 2020: Public Hearing on Proposed Wholesale Drug Importation Program* at 12 (Dec. 10, 2020), https://www.nmhealth.org/publication/view/report/6519/.

importation could bring cost savings to U.S. consumers, finding that generic drugs, which "account for most prescription drugs used in the U.S. . . . are usually less expensive in the U.S. than abroad."[41]

Third, the HHS Task Force opined that, overall, any potential cost savings arising from a drug importation scheme would be minimal and accrue primarily to intermediaries and third party payers. Indeed, "[t]otal savings to drug buyers from legalized commercial importation would be one to two percent of total drug spending" and a majority of these savings would go to third party payers, such as insurance companies and health maintenance organizations, and intermediaries.[42] Consumer cost savings are not part of the equation.

HHS conceded in the Final Rule that it is unable to estimate any potential cost savings for U.S. consumers arising from SIPs due to the dearth of data on "the likely size and scope of SIPs, the specific eligible prescription drugs that may be imported, the degree to which these imported drugs will be less expensive than non-imported drugs available in the United States, and which eligible prescription drugs are produced by U.S.-based drug manufacturers."[43] SIPs will not only undermine the American public's health and safety but will also fail to fulfill their promise of "significant" cost savings to U.S. consumers.

## III.   THE SIP PROCESS DENIES INTERESTED STAKEHOLDERS THE OPPORTUNITY TO PARTICIPATE IN AND COMMENT ON SIP PROCEEDINGS

Plaintiffs argue that the SIP process denies interested persons the right to prior notice or an opportunity to comment on SIP proceedings, and Defendants do not dispute this. Plaintiffs

---

[41] HHS Task Force Report at XIII.

[42] *Id.* at 65.

[43] Final Rule at 62,095-96.

and their members include "manufacturers who will be directly subject to costly legal requirements and other injuries as a result of a SIP" and "pharmacists and others who will be injured by SIPs that provide insufficient safeguards against unapproved, misbranded, and adulterated drugs."[44]

IMC has a similar interest in how SIPs may impact its member manufacturers in particular and Canadian consumers generally, as well as an interest in having the opportunity to express its concerns during SIP proceedings. As currently designed, the SIP process excludes potentially interested stakeholders like IMC and others similarly situated from participating in or commenting on the SIP process or addressing the unique requirements of any individual SIP. For that reason, IMC shares Plaintiffs' concern that the SIP process violates the procedural rights of interested stakeholders to participate in SIP proceedings if they so choose.

## CONCLUSION

IMC submits this brief in support of Plaintiffs' opposition to Defendants' motion to dismiss. The Canadian pharmaceutical industry is committed to making safe and effective medicines available both in Canada and in the United States. Because of the significant risk SIPs pose to U.S. and Canadian consumers, IMC opposes implementation of these programs as failing to achieve their intended purpose. IMC respectfully requests that this Court deny Defendants' motion to dismiss for the reasons set forth in Plaintiffs' opposition.

---

[44] Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss at 39.

Respectfully submitted,

/s/  Paul M. Kerlin

| | |
|---|---|
| Declan Hamill | Karen C. Corallo (DC Bar No. 219249) |
| Vice President | Paul M. Kerlin (DC Bar No. 993243) |
| Policy, Regulatory and Legal Affairs | Amanda H. Chan (DC Bar No. 1617305) |
| Innovative Medicines Canada | Skadden, Arps, Slate, Meagher & Flom LLP |
| 1220-55 Metcalfe Street | 1440 New York Avenue NW |
| Ottawa, ON, K1P 6L5 | Washington, D.C. 20005 |
| (613) 236-0455 ext 425 | (202) 371-7000 |
| dhamill@imc-mnc.ca | Karen.Corallo@skadden.com |
| | Paul.Kerlin@skadden.com |
| | Amanda.Chan@skadden.com |

*Counsel for Amicus Innovative Medicines Canada*

October 7, 2021